MAUSSEAUX (GAINES v.).    See Case No. 5,176.

---

## Case No. 9,316.

### The MAVERICK.

### HARDING v. The MAVERICK.

[1 Spr. 23; [1] 5 Law Rep. 106].

District Court, D. Massachusetts. March Term, 1842.

FERRY—LICENSE TO KEEP—ASSIGNMENT — COLLISION—UNLAWFUL USE OF WATERS—USAGE.

1. A license to keep a ferry, under the statutes of Massachusetts, is not assignable.

[Cited in The Leopard, Case No. 8,264.]

2. The charter of the Eastern Railroad Corporation does not authorize the company to maintain a ferry between Boston and East Boston, and take toll for travel and purposes not connected with their road.

3. A steamer used as a ferry-boat, and in the act of transporting passengers in the harbor of Boston in violation of law, came, by accident, in collision with a vessel which was in the lawful use of the waters of the harbor: *Held*, that the steamer was liable for the damage done by such collision.

[Cited in The Morning Star, Case No. 9,817; Todd v. The Tulchen, 2 Fed. 603.]

4. A usage for vessels to let go their warps, upon the approach of the steamer, must be presumed to be founded on the supposition that the steamer was in the rightful use of the waters of the harbor. A usage which would require those who are in the legal use of the waters as a highway, to yield to others who are using them for an unlawful purpose, will not be upheld.

[5. Cited in The Willard Saulsbury, Case No. 17,681, to the point that this court has jurisdiction of an action in rem brought by a person injured on board a vessel against the vessel causing the collision.]

This was a libel for a tort. The Maverick, a steamboat, was plying as a ferry-boat between one part of Boston, and another part called East Boston. The brig Southern, of which the libellant was mate, had run a warp across the usual track of the steamer, and near the head of the dock. In her passage, the steamer ran against the warp, and, by

[1] [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

means thereof, broke the leg of the libellant, and inflicted other injuries. The claimants [Fettyplace and Lamson] produced in evidence a license to keep a ferry, granted by the proper authorities, in the year 1832, to William H. Sumner, Stephen White, and Francis J. Oliver, and several instruments by which the said Sumner, White and Oliver, subsequently conveyed to the claimants all the steamboats and other boats and vessels used in said ferry, including the Maverick by name, and also all the rights and privileges which had been granted to the said Sumner, White and Oliver, by the said license, and constituted the claimants their attorneys irrevocable, with power of substitution, to keep and maintain said ferry, and to do all other acts, matters and things, which said attorneys, their successors, representatives or assigns, should deem needful or expedient for the support and management of the ferry, and to receive the tolls to their own use.

B. R. Curtis, for libellant.
S. Bartlett, for respondents.

SPRAGUE, District Judge. It is contended, in the first place, that the claimants had no right to keep a ferry, and that the Maverick was used for that purpose in violation of law. The instruments which have been put in evidence, constitute an assignment of the ferry, and divested the licentiates of all power and control over it. They go beyond the case of Gerrish v. Sweetser, 4 Pick. 374, in which it is said, that an irrevocable power to receive a sum of money, to the attorney's own use, is prima facie an assignment. Here is an express conveyance, to which the power of attorney is only auxiliary.

[They have produced a license granted by the proper authorities in the year 1832, to William H. Sumner, Stephen White, and Francis J. Oliver, and an instrument bearing date the 9th of December, 1839, by which the said Sumner, White, and Oliver, conveyed to the claimants, and one John Binney, who is since deceased, all the steamboats and other boats and vessels used in said ferry, including the Maverick by name, and also all tolls, ferriage and profits and income which had been received or which should thereafter be received from the ferry, and all profits and advantages whatever, which could or should be derived therefrom. All which the claimants and said Binney, and their executors, administrators, and assigns, were to hold as trustees for a certain voluntary association, called the East Boston Company. By the same instrument, the said Sumner, White and Oliver constituted the claimants and said Binney and their successors in said trusts, representatives, and assigns, their attorneys irrevocable to keep and maintain said ferry, and to do all other acts, matters, and things, which said attorneys, their successors, representatives, or assigns, should deem need-

ful or expedient for the support and prudent management of the ferry; and also to establish, regulate, and change the rates of toll or ferriage, and to demand and receive said tolls and ferriage, and dispose thereof, and also full power to substitute any agent or agents under said attorneys, and their powers at pleasure to revoke. And said Sumner, White, and Oliver covenanted that they would not "in any manner obstruct, hinder, defeat, or interfere with the claimants and said Binney, their successors, representatives, or assigns, or any of them, in the conducting and management of said ferry." The same instrument also contained a covenant for further assurance and a declaration by said Sumner, White, and Oliver, of their "free consent for the city of Boston. or the government, to revoke the license granted to them, and to grant the same to said claimants and Binney, in their said capacity of trustees, or their successors or representatives in said trusts," &c. The claimants also gave in evidence another instrument bearing date the same 9th of December, 1839, by which they and said Binney covenanted with said Sumner, White, and Oliver, and others, members of said East Boston Company, to hold the said property and the ferry as trustees, and subject to the control of said association. They also produced another instrument, bearing date the 19th of December, 1836, being an indenture of three parts, between the said trustees, said East Boston Company, and the Eastern Railroad Company; by which the latter is substituted in the place of East Boston Company, so far as relates to the ferry and the property connected therewith. These instruments constitute an assignment of the ferry, and divested the licentiates of all power and control of it. They go beyond the case cited from 4 Pick. 374, in which it is said that an irrevocable power to receive a sum of money to the attorney's own use is prima facie an assignment. Here is an express conveyance, to which the power of attorney is only auxiliary.] [2]

Was this ferry assignable? This question must be answered by referring to the Massachusetts statute of 1796, c. 42, to which it owed its existence. The first section provides, "that no person or persons whatever shall keep a ferry in this commonwealth, so as to demand or receive pay, without a special license first had and obtained from the court of general sessions of the peace of the county wherein such ferry may be; and the said court is hereby empowered to grant such licenses to such person or persons, as shall be judged suitable for such service, by the same court." By the third section it is enacted, "that if any person or persons shall keep a ferry, or transport passengers over or across any stated ferry, so as to demand or receive pay, having no right or au-

2 [From 5 Law Rep. 107.]

thority so to do, he shall forfeit and pay for every such offence, four dollars." The Revised Statutes which went into operation in 1836, have substantially re-enacted the same provisions. Chapter 26, §§ 1–6.

At the time of the passing of the statute, ferries constituted indispensable links in the chain of communication between different parts of the commonwealth; and so important was it deemed to secure fit persons as ferrymen, that it was provided by law, that no one should keep a ferry unless previously judged suitable, and specially licensed therefor by an established tribunal. It was a personal trust, to be reposed in those only whose qualifications had previously been considered and approved by the court, and is no more transferable than the office of a guardian, or the power of a master over his apprentice. If the licentiate can, by means of an assignment, appoint his successor, then a person becomes a ferryman, whom the court have never licensed, and of whose fitness they have had no opportunity to judge. It is not necessary to decide how far the person appointed must devote his personal attention to the management of the ferry; it is sufficient to say, that he must at least have a control over it, and that those who are engaged in its management must be not merely in name, but really, his agents or servants.

It has been contended, that this ferry was, in truth, kept by the Eastern Railroad Company, and that they are authorized to maintain it by the first section of their charter. Its language is as follows: "And said corporation is hereby authorized and empowered to locate, construct, and finally complete a railroad from the city of Boston to the boundary line between the commonwealth of Massachusetts and the state of New Hampshire; on or near the line next hereinafter described, beginning at or near the land or wharf of the Lewis Wharf Company; thence by steamboats, or other boats, over and across the ferry, to East Boston, so called; thence," &c., locating the road to the boundary of the commonwealth. This is merely descriptive of the line of the road. It was to run from a point at or near Lewis' wharf, over and across the ferry to East Boston. The ferry is mentioned only to designate the route over which the corporation were to pass by steamboats, or other boats, for the purposes of a railroad. It certainly is not to be understood that this railroad corporation was authorized to establish and maintain a ferry and take toll for all travel, and for purposes in nowise connected with their road. The route of the road passes over the Merrimack river, and across the site of a bridge. Could the corporation, there, establish a general toll bridge, independent of the railroad? But further, this charter was granted on the 14th of April, 1836. The ferry had been established, and Sumner, White and Oliver appointed ferrymen, in 1832. The second section of the charter declares, that

"nothing herein contained shall be construed to confirm, interrupt or impair, the existing rights of any corporation, person or persons, owning or interested in any ferry already established or licensed." This removes all pretence for saying, that the pre-existing ferry was intended to be merged in the railroad. It is preserved distinct and independent, and in nowise to be interrupted or impaired.

I am constrained, therefore, to say, that neither under the license to Sumner, White and Oliver, nor under the charter of the Eastern Railroad, do the claimants derive any legal right to maintain this ferry; and that in doing so they are contravening the express provisions of the statute.

But it is contended that the injury to the libellant arose from the misconduct or negligence of those on board the brig, and this on several grounds.

[In the first place, it is said, that the hawser was run for the purpose of obstructing the ferry-boat. In support of this, the claimants rely upon the previous occurrences in the morning, and upon the testimony of Keen, Douglas, Jolliffe, and Porter; and to repel it, the libellants refer to the testimony of Eldridge, Rider, Green, and Stetson. I do not propose to detail the very voluminous and contradictory evidence in relation to this and other matters of fact, which have been in contestation. To do so would answer no purpose, except perhaps to satisfy the counsel that the court had taken into view all the evidence upon which they relied. The brig lay at Lewis's wharf; there was a bona fide intention to remove her to the northward, for the purpose of taking her to Pratt & Cushing's ways. To carry this into effect, the captain gave orders to take the hawser out of coil and run it to the wharf south of the ferry-way, preparatory to removing the vessel. Considering the improbability that the captain would designedly bring a valuable vessel, of which he was part owner, with a cargo on board, and without cables and anchors, in collision with a steamboat, that all those engaged in this service, with the exception of Jolliffe, had given testimony going to negative such a design, and that the running the hawser may well be attributed to another and a legitimate purpose, and that the hawser was slacked up immediately on the approach of the boat, I am of opinion that this allegation of an attempt purposely to obstruct the steamboat, is not maintained. It is further contended, that, as the brig had no cables and anchors, it was negligence to attempt to remove her without having a stern line, so as to be prepared to let go the warps at the bow on the approach of the steamer. Whether such a line ought to have been previously run, is a question which nautical men, or those practically acquainted with moving vessels in harbors, are most competent to decide. Many such have given their depositions in this case, and their opinions have been extracted on various points. But to no one of them has

this question been propounded. The mate, who made these arrangements, is proved to have been experienced and skilful in his profession. He had a warp and a hawser ahead. I cannot undertake to say that it was a want of ordinary care not also to have had a stern line. It is further contended, that there was want of due care in several particulars: 1st, in making fast the hawser to the windlass bitts, so as not to be cast off readily. 2d, in not hailing the steamer earlier, in order to give notice not to approach. 3d, in not having slacked up the warp and hawser earlier. 4th, that the warp was full of kinks, and should not, therefore, have been permitted to run out through the chocks, as it was liable thereby to bring her up. But whatever kinks there may have been, they did not catch in the chock, and in no way contributed to the disaster. As to making fast the hawser to the windlass bitts, no witness testifies that this was improper, or that there was any better manner of securing it. I do not see how an earlier hail from on board of the brig could have been of any utility. The wind was strong from a northeast direction, and, with the noise of the paddles and machinery, must have prevented any hail being heard by those on board the boat until after they must have seen the hawser and warp. They knew that a prior attempt had been made to haul the brig, and it is in proof, that they were on the look-out, and saw the warp, and hailed the brig to have it slackened. A main ground of the defence is, that such were the wind, currents and obstructions, that it was impossible for the boat, after she passed the ship, to stop or retreat, or to have taken any other course than directly across the wharf. No hail could possibly have been heard by the steamer before she passed the ship; how then could it have been of any utility? With regard to the objection that the warp and hawser ought to have been slackened earlier, although there is a conflict of testimony as to the time when this was done, or how soon after the first hail from the boat, there is no doubt that they were slackened some time before the boat came up to them. The damage was occasioned by the boat's taking the warp, which, being a new manilla rope, did not sink. If it had been cast off at the instant of the first hail, or at any time after those on board the brig had reason to apprehend that the boat would cross it, it would still have floated upon the surface and obstructed the boat. But there is another and broader answer to this objection, which reaches also to the allegation of negligence in not having a stern line, so as to be prepared to let go the warp, and in making fast the hawser to the windlass bitts.]2

These complaints of negligence all rest upon the assumption that it was the duty of the brig to let go her warps on the approach of the steamer. There is much conflicting testimony, as to the usage in such cases, but I think the preponderance is in favor of the ferry boats; and that it is proved to have been the general practice for other vessels to yield to them, on their approach, and to slacken their warps to permit them to pass. I am not so well satisfied that the same usage prevails with respect to the approach of sailing vessels.

Without pausing to inquire how far a special usage, as to this ferry, ought to be brought home to the knowledge of those on board the brig, in order to be binding upon them, it is sufficient to say, that it must have been founded upon the supposition that this ferry was legally maintained, and that these boats were in the rightful use of the waters, for that purpose. But we have seen that this was not the fact, and any usage founded upon it must therefore fall. Indeed, the law would not uphold a usage, by which those who were in the legal use of these waters as a highway, should be bound to yield to others who were in the act of using it for an unlawful purpose.

It is further insisted that the libellant was negligent of his own personal safety. On the approach of the steamer, he let go his fasts which crossed her track, and ran aft for the purpose of having a stern line made fast to the steamer North America, and while doing this, his leg was caught in the warp, as it was running out, and he received the injury complained of. It is said that the warp was lying near to the libellant; that he was warned of his danger, and that he was unnecessarily taking another turn of the rope which led to the North America, around the cleat where it was fastened on board the brig. It is not denied that the line to the North America was necessary. The warp and the hawser had both been let go. There was nothing then to hold her, and she was without cables and anchors. There was no time for deliberation; the line must be made fast, and done instantly. The evidence of his being warned is, that one of the witnesses called out to him that he had better take care of his legs, as the steamer was going to take the lines; that he got tangled in the coil, and then jumped clear of it, and soon afterwards, while making fast the rope, he got caught again. It does not appear in what manner he could have avoided the danger; he was not at liberty to leave the place, and was performing an indispensable duty, which demanded his attention at the instant. To obviate the pressure of this fact, it is indeed said, that the rope had been already sufficiently made fast, and that the turn he was then taking was unnecessary. That rests entirely upon the opinion of Jolliffe; who says, that he thinks she was sufficiently fast before; but the libellant thought otherwise, and from the testimony in the cause, his experience and skill would entitle his judgment to a preference over that of Jolliffe. He was in command of the brig; upon him rested the responsibility of her safety; this was the only line by which

---

2 [From 5 Law Rep. 109.]

she was to be held, and it would be harsh and presumptuous to condemn him upon the critical suggestion, that the last turn of the rope was unnecessary, and this, too, merely upon the opinion of a witness who was less skilled and who felt no such responsibility.

What then is the posture of this case? The brig Southern being in the legitimate use of these waters as a highway, for a lawful purpose and in a proper manner, comes in collision with the steamer Maverick, which, at the time, is using them in transporting passengers, as a ferry boat, in direct violation of law. Supposing the collision to have been accidental, which shall bear the loss occasioned thereby? Authorities upon this point have been cited at the bar. In the cases of Leame v. Bray, 3 East, 593, and Bullock v. Babcock, 3 Wend. 391, which were actions of trespass, the lawfulness of the purpose is adverted to as a material circumstance. In the former, Lord Ellenborough, alluding to another case, says: "Where one shooting at butts for a trial of skill, with the bow and arrow, the weapon then in use, is in itself a lawful act, and no unlawful purpose in view, yet having accidentally wounded a man, it was holden to be a trespass. * * * Such, also, was the case of Weaver v. Ward, Hob. 134, where a like unfortunate accident happened, whilst persons were lawfully exercising themselves in arms." In Hammond's note (d) to Comyn's Digest, "Battery," A, it is said: "In order to render a trespass excusable, not alone must the act itself have been inevitable, the party must be altogether blameless with regard to the circumstances which led to it; for if the defendant has wrongfully placed himself in a situation whereby he becomes the instrument of mischief to another, he cannot excuse himself by saying that the accident happened without the possibility of his preventing it at the time." Davis v. Saunders, 2 Chit. 639, was a case of collision. The plaintiff's sloop had made fast to a raft of brandy which had been sunk by smugglers, and was endeavoring to secure it. The defendant's sloop came up and attempted to obtain the brandy, and the two sloops, by the force of the sea, were thrown against each other. The case turned on the question, whether the defendants were doing a lawful act; and the court decided in their favor, solely on the ground that their "original act was not unlawful." It was formerly contended, that, if a person injure another by violence, he is responsible in damages although it was accidental. But it is now settled, that he is not liable for a mere accident, although accompanied by force, provided he is not engaged in an unlawful act. This limitation upon the immunity for accidents is frequently mentioned in the books, and I am not aware that it is anywhere denied.

It is insisted by the counsel for the claimants, that if these principles are anywhere recognized by the law, it is only when the act done is contra bonos mores, or an offence at common law; and that a violation of a statute provision secured by penalties, is not within the alleged principle.

In the case cited by him, of Atkinson v. Abbott, 11 East, 135, Lord Ellenborough remarks, that the statute of Charles II., by which a penalty is imposed for taking out a false clearance, does not make the voyage illegal. But our statute does make the voyage, if it may be so called, illegal. It prohibits the keeping a ferry, or transporting passengers over any stated ferry. Every trip, therefore, was a violation of the statute. The cases of Rex v. Dickenson, 1 Saund. 135; Anonymous, 3 Salk. 25; Rex v. Buck, 2 Strange, 679, merely go to establish the well known doctrine, that where an act allowed by the common law is prohibited by statute, and the mode of prosecution is prescribed by the statute, that mode must be pursued, and not the common law method by indictment. But the case now before the court is not a prosecution against the claimants for keeping a ferry, but a suit for running forcibly against a warp, by which the libellant was injured. The respondents, to justify this act of force, say, in substance, that they were duly licensed to keep a ferry, and were running the Maverick as a ferry boat. as they lawfully might. The reply is, that they were not licensed to keep a ferry, and in doing so were violating the law; and, therefore, are not entitled to the immunity which they claim. The libellant rests on the principle that if one, while doing an unlawful act, comes in contact or competition with another, who is pursuing his lawful occupations, the law gives a preference to the latter, and inclines the balance against the former.

The ground assumed by the respondents is, that the only inconvenience to which the party who violates a statute is subjected is the penalty which it prescribes. But I apprehend that this is not well founded. There are disabilities or liabilities to which the law subjects him, as consequent upon his unlawful act, wholly distinct from the penalties of the statute. Thus, in Wheeler v. Russell, 17 Mass. 278, the plaintiff had sold and delivered to the defendant a quantity of shingles, and taken his note for the price agreed. The action was upon the note. The defence was, that the plaintiff in selling the shingles, had violated a statute. The court sustained the defence, and refused to enforce the note, although the price agreed was no more than the fair value of the property which the plaintiff had parted with. In that case the authorities were collected with great diligence and ably and elaborately examined at the bar. The chief justice, in delivering the opinion of the court, says: "No principle of law is better settled than that no action will lie upon a contract made in violation of a statute, or of a principle of the common law," thus in terms rejecting the distinction now set up. In Moody v. Ward, 13 Mass. 299, the defend-

ant, a colonel in the militia, had mustered his regiment in the highway. After he had dismissed the regiment and retired from the field, the plaintiff's horse in passing along the highway, was frightened by the firing of the soldiers, who were remaining there, ran against a shaft and was killed. It was contended, in behalf of the plaintiff, that the defendant was liable, because mustering his regiment in the highway was prohibited by statute. The court said, that it did not appear that the defendant was to blame, unless the mustering there was unlawful, and as that point was not made out, they therefore decided in favor of the defendant.

The distinction contended for does not seem to be established, at least in civil cases, by authority; and I see no ground on principle for introducing it. The common law is said to be founded upon immemorial customs, which are supposed to embrace acts of the legislature, the records of which have been lost by lapse of time. But why should these be more efficacious in any respect, or their inviolability be more sedulously guarded by consequential liabilities, than acts of the legislature, the records of which are preserved?

The view which I have taken of the case renders it unnecessary to consider whether there was any negligence in the manner in which the steamer was conducted, or not. As the libellant was engaged in a lawful occupation, and the Maverick, when she ran against his warp, was running as a ferry boat, and in the act of transporting passengers, in violation of law, I am of opinion that she must be responsible, even for accidental damages occasioned thereby.

Decree for the libellant for $1400 damages and costs.