[S. F. No. 12388. In Bank.—May 31, 1928.]

THE GOLDEN GATE FERRY COMPANY (a Corporation), Petitioner, v. RAILROAD COMMISSION OF THE STATE OF CALIFORNIA, Respondent.

Dudley D. Sales, Devlin & Brookman, and Warren Olney, Jr., for Petitioner.

Carl I. Wheat, Arthur T. George and Reginald L. Vaughan for Respondent.

Brobeck, Phleger & Harrison, *Amici Curiae*.

Guy V. Shoup, Evan J. Foulds, Henley C. Booth for Southern Pacific Company.

LANGDON, J.—This is an application for a writ of review. The petitioner, The Golden Gate Ferry Company, alleges that it was and now is engaged in the business of operating a public ferry for which tolls are charged for the transportation of passengers and self-propelled and other vehicles on, over, and across the waters of the San Francisco Bay; that it is the owner and in the possession of a franchise

granted by the board of supervisors of the city and county of San Francisco authorizing the establishment, operation, and maintenance of a public ferry between points in the said city and county of San Francisco and the city of Alameda, county of Alameda; that on the twenty-sixth day of March, 1926, petitioner filed its application with the Railroad Commission of the state of California, pursuant to the provisions of section 50d of the Public Utilities Act (Stats. 1911 [Ex. Sess.], p. 18, and amendments thereto), requesting said Commission to issue and grant to petitioner a certificate of public convenience and necessity to operate vessels between the city of San Francisco and the city of Alameda; that a hearing was had thereon by said Commission, but no decision or order has as yet been made or rendered therein; that on or about September 3, 1926, the Southern Pacific Company, a railroad corporation, commenced the operation of a public vehicular ferry between a point within the city of San Francisco and a point within the city of Alameda; that in commencing said vehicular ferry service between said points, the Southern Pacific Company for the first time put into operation between said cities an entirely new, different, and distinct type of vessel, namely, that type of vessel which is designated as a vehicular ferry; that vessels of such construction and type had never theretofore been operated by said Southern Pacific Company between any points in San Francisco and Alameda; that on July 15, 1926, and prior to its operation of said vehicular ferry between San Francisco and Alameda the Southern Pacific Company filed with the respondent Commission an amendment to its tariff schedules naming rates for vehicular ferry service between, among other points, San Francisco and the Alameda pier; that said amendment was the first filing by the Southern Pacific Company of any rate for vehicular ferry service between any point in San Francisco and any point in Alameda; that prior to said amendment the Southern Pacific Company had no rate on file with the respondent Commission or any tariff applicable to the transportation of vehicles between any point in San Francisco and said Alameda pier, or any other point in Alameda; that said Southern Pacific Company has never received or petitioned for or in any manner sought from the respondent Commission a certificate of public convenience and necessity to operate vessels in

vehicular ferry service between San Francisco and the Alameda pier or any vehicular ferry service between the city of San Francisco and the city of Alameda; that there has never issued to the Southern Pacific Company nor to any of its lessees or subsidiaries any such certificate of public convenience and necessity as required by the provisions of section 50d of the Public Utilities Act and said Southern Pacific Company is without lawful right, authority, or privilege to operate said or any vessels for automobiles or other vehicular ferry service between the city of San Francisco and the said city of Alameda; that the Southern Pacific Company had not for a period of thirty-two years prior to September 3, 1926, engaged in the transportation of vehicles between any point in the city of San Francisco and the city of Alameda; that the respondent Commission, of its own motion, instituted a proceeding having for its purpose an investigation into the construction of facilities and the rendering of a vehicular ferry service by the Southern Pacific Company between said two points without first having obtained a certificate of public convenience and necessity; that the respondent Commission permitted the petitioner herein to intervene in said proceeding as an interested party; that petitioner has been and now is an interested party in said proceeding and in the action, determination, and decision therein; that the respondent Commission on the seventeenth day of December, made, rendered, and filed its opinion and order, concurred in by a majority of its members, declaring, in effect, that the Southern Pacific Company was and is not required to secure a certificate of public convenience and necessity under the provisions of section 50d of the Public Utilities Act authorizing it to inaugurate a vehicular ferry service between the city of San Francisco and the Alameda pier; that thereafter and within twenty days from the making of said order and decision the petitioner herein filed with the respondent Commission its petition for rehearing, which said petition was denied on January 6, 1927; that the majority opinion and order of the respondent Commission declaring that the Southern Pacific Company was and is not required to secure a certificate of public convenience and necessity under section 50d of the Public Utilities Act for the operation of a vehicular ferry service between the city of San Francisco and the city of Alameda, is illegal, void, and

in excess of the jurisdiction of the respondent Commission. Wherefore, the petitioner prays that this court enter its decree and judgment, annulling and setting aside the majority opinion and order of the respondent Commission referred to above.

The sole question presented in this proceeding for a review of said order revolves about the interpretation to be given to section 50d of the Public Utilities Act as amended in 1923 (Stats. 1923, pp. 834, 836). The section reads: "No corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, shall hereafter operate or cause to be operated, any vessel between points exclusively on the inland waters of this state, without first having obtained from the railroad commission a certificate declaring that present or future public convenience and necessity require or will require, such operation, but no such certificate shall be required of any corporation or person which is actually operating vessels in good faith, at the time this act becomes effective, between points exclusively on the inland waters of this state under tariffs and schedules of such corporation or persons, lawfully on file with the railroad commission."

It is contended by the Southern Pacific Company that its operation is and has been such as to bring it within the exemption contained in section 50d; that is to say, it is urged by said company that on August 16, 1923, the effective date of section 50d of the Public Utilities Act, it was operating vessels in good faith between points exclusively on the inland waters of this state and more particularly between the city and county of San Francisco and the Alameda pier, under tariffs and schedules lawfully on file with the respondent Commission. In view of the existence of these facts, it is urged by the Southern Pacific Company that it may properly operate and maintain, by virtue of the exemption provision found in section 50d, a public vehicular ferry service between said points without first acquiring from the respondent Commission a certificate of public convenience and necessity.

Petitioner contends, on the other hand, that the operation of a vehicular ferry service by the Southern Pacific Company between San Francisco and the Alameda pier does not fall within the exemption provided for in said section 50d,

for "that section exempted any existing operator from the necessity of obtaining a certificate of public convenience and necessity for any operations being conducted in good faith on that date, or for the exercise of any rights being exercised on that date, but did not exempt any operator from securing a certificate of public convenience and necessity for the commencement of any new operations not theretofore being conducted or for the exercise of any rights not theretofore being exercised."

   ▉ It is undisputed that for a period in excess of thirty-two years preceding September 3, 1926, Southern Pacific Company operated no vessels between any point in Alameda and any point in the city and county of San Francisco, except for the transportation of passengers carried on its trains. Prior to 1894 said company operated vessels which were used to transport vehicles between its Alameda pier and a point in San Francisco. In December, 1894, however, the plank road along the Alameda pier was torn up and since that time and until a new road was built in 1926 no service was offered to the public by Southern Pacific Company for the transportation of vehicles between any point in Alameda and any point in San Francisco. It is apparent, therefore, that whatever service the Southern Pacific Company or its predecessors may heretofore have offered to the public in the way of vehicular transportation between Alameda and San Francisco was abandoned. It would seem to follow that after such service was abandoned, the obligation to render it ceased and the right of the public to insist upon it was terminated. A similar situation was presented in the case of *Atchison, Topeka & Santa Fe Railway Company* v. *Railroad Commission,* 173 Cal. 577 [160 Pac. 828]. There railroad service between two points had been discontinued for about twenty years. A complaint was filed with the Railroad Commission to require the re-establishment of that service. The Commission made an order requiring the railroad company to re-establish the service. Upon appeal, it was held that the Commission acted beyond its jurisdiction, the following language being used:

"Nor is the fact that a railroad line had once existed between Fallbrook and Temecula a factor of any moment in the present inquiry. No question is made of the authority

of the Railroad Commission to compel a railroad company or other public utility to restore a service which it has been furnishing. Here, however, the line between Fallbrook and Temecula had been destroyed for about twenty years before the action of the Commission was invoked, and, indeed, before the enactment of the law upon which the Commission relies for its authority to act. It is expressly found that 'that portion of the line was left abandoned and service discontinued. It has remained abandoned ever since.' In view of this fact, it cannot be doubted that any obligation of the predecessor of the Santa Fe Company to maintain and operate the line from Fallbrook to Temecula had long since ceased (*Public Service Com.* v. *Philadelphia etc. Ry. Co.,* 122 Md. 438 [89 Atl. 726]), and that no such obligation ever rested upon the Santa Fe Company itself. The duty to maintain the line was dependent upon the right to maintain it, and this right was lost by abandonment (*Home Real Estate Co.* v. *Los Angeles Pac. Co.,* 163 Cal. 710 [126 Pac. 972]), without regard to the question whether it had been forfeited under the provisions of section 468 of the Civil Code. The case must, therefore, stand precisely as it would if there had never been any connection between these two points.''

Likewise, in the instant case, it would appear that vehicular service between the points in question having been abandoned by Southern Pacific Company and its predecessors there was no obligation upon the part of the company to render it and no right in the public to insist upon receiving it.

Nor can it be said that a certificate of public convenience and necessity was unnecessary to inaugurate this service because the Southern Pacific Company was ''actually operating vessels in good faith under tariffs and schedules lawfully on file with the Railroad Commission,'' within the meaning of the Public Utilities Act. The briefs on file herein present three possible interpretations of the language just quoted: one, a legislative purpose to exempt a corporation operating vessels in any type of service on the inland waters of this state from securing a certificate; two, a legislative purpose to exempt a corporation that is operating a similar service to the one sought to be inaugurated from securing such a certificate, and, three, a legislative purpose

to exempt a corporation that is operating, at the time the act becomes effective, a service which is later to be continued, from securing such certificate.

We are of the opinion that the third alternative is the one which was intended by the legislature, i. e., that a corporation is exempted from obtaining the certificate if it was, at the effective date of the act, actually operating a service in all respects substantially the same as the service to be rendered after the act became effective. Since it is apparent that the section of the act under consideration is not clear and definite in expressing any of the above suggested alternatives, it becomes the duty of this court to construe the same with reference to the purposes sought to be served and the public policy underlying the legislation. ■ An examination of the entire act under consideration evinces a determined purpose to give to the Railroad Commission power to regulate transportation on the inland waters of the state by granting or refusing certificates of public convenience and necessity, and a construction of the act, such as contended for by respondents, so as to exempt any person or corporation from applying for such a certificate if he or it has been operating any type of vessel in any type of service before the act became operative, would leave with the Railroad Commission but a semblance of power, and to construe the act so as to exempt a corporation from securing a certificate to carry freight if it had previously carried freight over a different route, but one comparable in some of its features to the new route sought, would be to give an elasticity to the language and the action to be taken under it which would result in confusion and litigation and impotency on the part of the Commission. The safe, definite rule, and the one supported by the reason and purpose of the Public Utilities Act, would seem to us to be to construe the language, "operating vessels in good faith," to mean operating them in good faith in the essential and inherent features of the service sought to be continued after the effective date of the act. It seems apparent from the admitted facts that the Southern Pacific Company was not operating such a service at the date mentioned. A different type of vessel is to be used by the Southern Pacific Company from that used at the date of the act; a different route is to be taken, and a different class of service rendered.

The legislature, in 1917, enacted a statute regulating transportation by automobile stage (Stats. 1917, p. 330, as amended in 1919 [Stats. 1919, p. 457]), and therein relieved from the necessity of obtaining a certificate of public convenience and necessity companies actually operating in good faith at that time. The exemption portion of the statute was construed by this court in the case of *Motor Transit Co.* v. *Railroad Commission,* 189 Cal. 573 [160 Pac. 828], the court saying:

''The purpose in so exempting such companies was to refrain from interfering with the operations as then carried or—in other words, to confirm in these operators the rights they were at the time exercising. But such exemption was, obviously, only to the extent of the operations then conducted. To hold that by the operation of a through line on that date petitioners were given a franchise to operate to any extent that they, in their judgment, might see fit, limited solely by the restriction that the operations must be between the same termini and over the same route, would be to materially decrease the power of the Commission over these lines and thus overlook the primary purpose of the enactment, which was to give to the Commission, in the interest of the public, the fullest power possible to regulate the operation of auto stage companies.''

We see no essential legal distinction between the portion of the statute considered in the last cited case and the portion of the statute under consideration here.

Nor can we agree with respondents that the filing of a tariff amendment to the creek route vehicular tariff is the addition of a commodity to the Alameda passenger tariff. The tariff which was amended covered no service whatever between any point in the city of San Francisco and any point in the city of Alameda. At the time of the tariff amendment the Southern Pacific Company was engaged in the operation of vessels between Alameda pier and the Ferry Building in San Francisco for the transportation only of passengers transported over its railroad. It had no tariff on file for the transportation of any freight of any kind whatever. The operation of a vehicular ferry has no connection with the operation of a railroad service. It is in no way an adjunct of the railroad operation. A vehicular service could just as well be rendered by a corporation which

had no rights whatever to operate a railroad. The Southern Pacific Company, in another action, successfully maintained this contention before this court. (*Southern Pac. Co. v. Richardson*, 181 Cal. 280 [184 Pac. 3].)

The order of the respondent Railroad Commission filed herein is annulled.

Richards, J., Seawell, J., Curtis, J., Waste, C. J., and Shenk, J., concurred.

PRESTON, J., Concurring.—I concur in the judgment, but prefer to base my conclusion upon the following grounds:

This proceeding requires the court to declare the legislative mind when enacting on the fifteenth day of June, 1923 (Stats. 1923, p. 834), subdivision d of section 50 of the Public Utilities Act (Deering's Gen. Laws, part two, p. 2863, title 464), which reads in part: "No corporation or person, their lessees, trustee, receivers or trustees appointed by any court whosoever shall hereafter operate or cause to be operated, any vessel between points exclusively on the inland waters of this state, without first having obtained from the railroad commission a certificate declaring that present or future public convenience and necessity require or will require such operation . . . ," together with the following exception, or proviso: ". . . but no such certificate shall be required of any corporation or person which is actually operating vessels in good faith, at the time this act becomes effective, between points exclusively on the inland waters of this state under tariffs and schedules of such corporations or person lawfully on file with the railroad commission." The effective date of this amendment was August 16, 1923.

Our particular task lies in declaring the scope and meaning of said proviso as applied to the following undisputed facts: The Southern Pacific Company, a Kentucky corporation, on the effective date of said amendment, was operating across San Francisco Bay, inland waters of the state of California, a motor vehicular ferry service between San Francisco and a point at the foot of Broadway in Oakland, situated upon the north bank of a stream commonly called San Antonio estuary, being navigable waters leading into San Francisco Bay. This ferry was known as the Oakland Creek Route ferry. It was also operating at the

same time a line of vessels between a point on the San Francisco shore of said bay and a point on the opposite shore known as Alameda mole, said mole forming in fact the southern bank of said San Antonio estuary, the center line of which said estuary marks the dividing line between the municipalities of Oakland and Alameda. This Alameda line of vessels, however, was not used as a general ferry, but was used exclusively as an extension of the suburban railway system of said corporation. Said Southern Pacific Company on said date had a set of one-way and commutation passenger tariffs on file with the Railroad Commission of the state, but it had no commodity tariffs on file for service between said points. It carried no passengers who were not to use or who had not used its railway lines. Its service at that point connected with no highways nor was there any highway at all leading from the Alameda mole to the mainland. It possessed no local ferry franchises either from the city and county of San Francisco or from the county of Alameda nor from any municipality for such operation. The public who had vehicles or animals or baggage to transport across said bay neither had the right to demand ferriage nor to have access to said vessels. As above stated, said company carried passengers for its interurban service only. It bases no claim to operate upon any franchise conferred by statute, but bases its claim to operate solely upon its charter rights as a railway corporation and such rights as it may have from usage or prescription.

On July 15, 1926, said Southern Pacific Company proceeded to file an amendment to its commodity tariffs theretofore applicable only to the said Oakland Creek ferry so as to include vehicular service to Alameda mole and thereafter and on or about August 15, 1926, prepared to operate a motor vehicular ferry line from San Francisco across said bay to Alameda mole. Such action on its part was stayed by injunction proceedings until on or about September 3, 1926, when it began to operate said ferry service and presumably now continues to operate it. Immediately thereafter the Railroad Commission of the state of California on its own initiative began an investigation pursuant to said section 50 of the Public Utilities Act, *supra*. Petitioner, The Golden Gate Ferry Company, a corporation, was allowed to intervene in said action. The basis of the investigation was

the failure of the Southern Pacific Company to seek or to obtain from the Railroad Commission of the state of California a certificate declaring that present or future public convenience required such vehicular service to be inaugurated and this failure furnishes the immediate grounds for the controversy before us.

The Railroad Commission, however, after investigation, decided that the action of the Southern Pacific Company in establishing this service between San Francisco and Alameda mole was legal and regular and within the said exemption and gave and made its order dispensing with the requirement that such company should obtain said certificate by dismissing the proceeding. The intervener, having secured a franchise from the city and county of San Francisco for a similar service, instituted this proceeding by a petition for *certiorari* and thereby attacks the validity of said order of the Railroad Commission and seeks to have the said order annulled as being in excess of the jurisdiction of the Commission; and to that end to have this court declare that under the undisputed facts shown by the record the Southern Pacific Company is required by law to obtain such certificate before it can validly exercise the right to conduct such vehicular ferry service.

The task is not free from difficulty. The proviso in question is far from being clear and definite because of the general terms employed. At the outset it must be observed that no good reason appears for concluding that the legislature intended to unduly expand the scope of said exemption. The evident purpose was to place within the jurisdiction of the Railroad Commission complete supervision over this type of public utility without disturbing privileges in the nature of vested rights theretofore held by others.

This court in *Motor Transit Co.* v. *Railroad Commission,* 189 Cal. 573, 580 and 585 [209 Pac. 586, 589], had before it the construction of legislation enacted in 1917 (Stats. 1917, p. 330), as amended in 1919 (Stats. 1919, p. 457), regulating transportation by automobile or autostage and, in speaking of the purpose of it, said: "It is in the interest of the public that the service rendered by public utilities be adequate and of good quality and the rates as low as possible commensurate with good service and a reasonable return to the owner. The certificate of public convenience and ne-

cessity is the means whereby protection is given to the utility rendering adequate service at a reasonable rate against ruinous competition. The person or corporation obtaining a certificate must operate at the times and in the manner prescribed by such certificate, thus furnishing uniform and efficient service to the public. If anyone else would be at liberty to operate without such a certificate he might operate at his own pleasure and only under favorable conditions, thus making it impossible for the holder of a certificate to successfully carry on his business. It is the public interest in efficient service which is being safeguarded by the requirement of a certificate. (*Oro Electric Corp.* v. *Railroad Commission,* 169 Cal. 466, 475 [147 Pac. 118]; *Public Utilities* v. *Garviloch,* 54 Utah, 406 [181 Pac. 272, P. U. R. 1919E, p. 182].) Such requirement is part of the regulation of transportation companies in the interest of the public. . . .

''The primary purpose of the legislature in enacting this statute was not to confer a franchise upon the operating companies but to give into the power of the commission for regulation and control in the interest of the public the operation of auto stages for transportation. It did this by requiring every auto transportation company to secure from the commission a certificate of public convenience and necessity. It relieved from the necessity of obtaining such certificate the companies actually operating in good faith at that time. The purpose in so exempting such companies was to refrain from interfering with the operations as then carried on—in other words, to confirm in these operators the rights they were at that time exercising. But such exemption was, obviously, only to the extent of the operations then conducted. To hold that by the operation of a through line on that date petitioners were given a franchise to operate to any extent that they, in their judgment, might see fit, limited solely by the restriction that the operations must be between the same termini and over the same route, would be to materially decrease the power of the commission over these lines and thus overlook the primary purpose of the enactment, which was to give to the commission, in the interest of the public, the fullest power possible to regulate the operation of auto stage companies.''

Passing now to a consideration of the language of the exemption before us, it is to be noted that the legislation concerning automobile transportation exemption above noted was provided by language as follows, to wit: ''. . . but no such certificate shall be required of any transportation company as to the fixed termini between which, or the route over which, it is actually operating in good faith at the time this act becomes effective.'' (Stats. 1919, p. 457.)

In the year 1927 (Stats. 1927, p. 240) the entire section (sec. 50) here under consideration was amended, subdivision d thereof being changed to read in part as follows: ''No corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, shall hereafter begin to operate or cause to be operated any vessel for the transportation of persons or property, for compensation, between points exclusively on the inland waters of this state, without first having obtained from the railroad commission a certificate, declaring that public convenience and necessity require such operation, *but no such certificate shall be required as to termini between which any such corporation or person is actually operating vessels in good faith at the time this act becomes effective, under tariffs and schedules of such corporations or persons, lawfully on file with the railroad commission . . .* '' (Italics ours.)

A careful consideration of these three enactments of the legislature convinces us that in principle they are the same. Indeed, we are unable to discover any difference whatever in meaning between the provision of section 50 as enacted in 1923 and the paragraph as re-enacted in 1927. To our mind both said provisions should receive a construction analogous to that received by the automobile transportation section construed in *Motor Transit Co.* v. *Railroad Commission, supra,* for it is evident from the context of the proviso that the exemption granted is not personal.

It is equally clear that the word ''vessel'' confers no special right on any particular craft as such, but that said word is to receive the same construction found in the introductory provision of the Public Utilities Act, which is as follows (Deering's Gen. Laws, part two, p. 2688, subd. **y** of sec. 2, act 6386): ''The term 'vessel,' when used in this act, includes every species of water craft, by whatsoever power operated, which is owned, controlled, operated **or**

managed for public use in the transportation of persons or property. . . . "

The manifest meaning, then, of said proviso, as compelled by the context of the enactment, is that the legislature intended to exempt from the requirement of said certificate the service or operation evidenced by water craft engaged in the independent public use of transporting persons or property; in other words, commence upon the inland waters as an independent enterprise. The words "between points exclusively on the inland waters of this state" mean definite fixed points at which vessels in service actually call.

Petitioner contends, as we understand it, that the word "vessel" used in said proviso is equivalent to the use of the word "ferry." We think the word has a broader significance, and although it includes a ferry, it also includes water craft service not properly covered by the word "ferry." For taxation purposes a ferry-boat has been defined as follows: "A ferry-boat is a vessel traversing across any of the waters of the state, between two constant points, regularly employed for the transfer of passengers and freight, authorized by law so to do . . . " (Pol. Code, sec. 3643.) It has been held in other jurisdictions, however, that intermediate points may be visited by the vessel and it will still retain its characteristics as a ferry-boat (*New York* v. *N. J. etc. Co.*, 106 N. Y. 28, 31 [12 N. E. 435]).

In *Vallejo Ferry Co.* v. *Solano Aquatic Club*, 165 Cal. 255, 271 [Ann. Cas. 1914C, 1197, 131 Pac. 864], a ferry has been defined and, citing said definition, the characteristics are again set forth as follows in *Menzel Estate Co.* v. *City of Redding*, 178 Cal. 475, 479 [174 Pac. 48, 49]: "Undoubtedly a ferry franchise has been so called, as, for example, in the opinion of this court, prepared by Mr. Justice Henshaw, in *Vallejo Ferry Co.* v. *Solano Aquatic Club*, 165 Cal. 255, where, at page 271 (Ann. Cas. 1914C, 1197, 131 Pac. 864, 871), the following language is used: 'A ferry franchise emanating from the supreme power of the state or its authorized mandatories, is a grant to a named person empowering him to continue an interrupted land highway over the interrupting waters.' In 19 Cyc. 493, cited by appellants, a ferry is called 'a public highway,' but with an important limitation. The definition there given (beginning on page 492), so far as of value to this discussion, is as follows: 'A

ferry is a liberty to have a boat upon a river for the transportation of men, horses, and carriages with their contents, for a reasonable toll. The term is also used to designate the place where such liberty is exercised. *In the latter sense* a ferry is a public highway, being a continuation of the highway with which it connects.' '' (See 25 C. J. 1048.)

An early definition of ferriage was given in *People* v. *San Francisco & A. R. R. Co.*, 35 Cal. 606, 619, as follows: ''A ferry, in its ordinary sense, is but a substitute for a bridge where a bridge is impracticable, and its end and use is the same. Like a toll-bridge, it is a franchise created for the use and convenience of the traveling public, as a link in the highway system of the country, and by no means includes the transportation of goods, wares, and merchandise by themselves, or, in other words, the carrying trade of modern commerce.''

From these definitions of the words ''ferry,'' ''ferry-boat'' and ''ferriage,'' it is evident that the word ''vessel'' covers a much broader field and should be held to include commerce on the inland waters of the state.

We are also convinced that the intention of this proviso was to exempt commerce upon the inland waters of the state which was being carried on between fixed points and which commerce was such as could be made the subject of franchises granted by a county or municipality within the state. In granting franchises, for example (Pol. Code, sec. 2892), the applicant is required to show ''the landings of the proposed ferry'' and ''if the applicant is not the owner of the land, that notice of the application has been served on the owner thereof at least ten days prior to the application.'' Indeed, other provisions of said section 50 indicate this fact by the use of the following words of subdivision e: ''The legislature hereby declares that the provisions of this section are being enacted under the state's reserved power over public utilities or corporations, or both, as the case may be, for the purpose of acting on the right of the grantee of a public utility franchise granted by a county, city and county or incorporated city or town, to exercise rights thereunder, and not for the purpose of acting on the right of any city and county or incorporated city or town to grant any such franchise. The legislature hereby declares that the provisions of this section shall be and remain in full force

and effect concurrently with the right of any city and county or incorporated city or town to grant franchises for public utilities upon the terms and conditions and in the manner prescribed by law."

That fixed points are contemplated is also evidenced by use of these words in subdivision d: "Every applicant for a certificate shall file in the office of the commission, application and evidence in such form as shall be required by the commission, and the commission shall have power, after hearing, to issue said certificate, as prayed for, or to refuse to issue the same, or to issue it for operation between certain points only." Of course, this does not mean that minor changes may not take place in the location of the termini.

These deductions make it evident that the Southern Pacific Company may not by filing an amendment to its Oakland Creek route tariffs be authorized to conduct a vehicular ferry to Alameda mole. Especially is this true as the company does not propose to discontinue the Oakland Creek service. The manifest intention of the legislature was to keep the control in the Railroad Commission over this class of public service and to allow such a use as is here proposed without a certificate of public convenience and necessity would be to materially impair the very object of the legislation.

The above observation also answers the contention that prior to the year 1894 the Southern Pacific Company did in fact operate a vehicular ferry between San Francisco and Alameda mole and for that reason it should now be allowed to resume such operation without a certificate. In that year the company abandoned the road leading to said mole and from that date until this controversy arose no means existed whereby vehicles could reach or leave said mole. "The idea of a ferry presupposes a road traveled by the public which is bisected by the watercourse, the ferry serving in a different way the same purpose that is served by a bridge. As the bridge is made for the road, not the road for the bridge, so is the ferry made for the road, not the road for the ferry; the ferry is the incident, the road is the principal." (*State ex rel.* v. *Wiethaupt*, 231 Mo. 449, 465 [133 S. W. 329].) Thirty-two years of disuse under these facts must be held to be an abandonment of any such prior right (*Atchison T.*

*& S. F. R. Co.* v. *Railroad Com.*, 173 Cal. 577 [160 Pac. 828]).

For the same reason the claim of the Southern Pacific Company is untenable that by consolidation during the period between 1885 and 1887 of three groups of railroad companies operating in the east bay region, it gained the right to segregate and co-ordinate its passenger, vehicular, freight, and other service by transferring the one from one ferry point to another *ad libitum.* To hold that the taking from the Alameda mole in 1894 of the vehicular service then existing and handling it through the creek route ferry was merely an act of efficiency and that such service may at any time be restored when in the judgment of the company it would be expedient to do so, would be in a great measure to consent to a monopoly of San Francisco Bay. Bearing in mind that the Southern Pacific Company claims only to be acting under railroad franchises and such other rights as may belong to it by reason of usage or prescription, it is evident that it may not change a local ferry service at will, for such service is a proper subject for regulation and control and such a concession to the Southern Pacific Company would be in a large measure to abdicate in its favor the franchise granting power as well as the right of the Railroad Commission to exercise control over utilities of this type.

This leaves to be answered but one other query: May the Southern Pacific Company engraft upon the Alameda local passenger train service this vehicular ferry operation? The question is far deeper than the mere right to add a commodity to an existing tariff. For the purposes of this case, this right as a general rule may be conceded. In fairness to the Southern Pacific Company it has but faintly asserted this claim, but respondent Railroad Commission places great stress upon it. The Southern Pacific Company did not attempt to amend the Alameda mole passenger tariffs. It attempted to amend the creek route vehicular tariff and attempted to split the vehicular service between the creek route and the Alameda mole route. It even contends that it owes no duty to submit to the jurisdiction of the Railroad Commission as to the pre-existing Alameda boat service, claiming to do so would be the impairment of a contract evidenced by its railroad charter· rights and cites in support

of this contention the recent case of *Postal Tel. etc. Co.* v. *Railroad Commission*, 200 Cal. 463 [254 Pac. 258].

The company also has in mind, no doubt, the holding of this court in the case of *Lake Tahoe etc. Co.* v. *Roberts*, 168 Cal. 551 [Ann. Cas. 1916E, 1196, 143 Pac. 786], that a steamboat in partial use of a railroad company for railroad purposes is not "any part thereof" for taxation purposes. In other words, if vehicular service should be confined in the same vessel with the Alameda passenger service, the boat might lose its status as a part of the operative property of the railroad company. This furnishes a reason for the act of the company in putting in a new line of boats to Alameda mole and not mixing its railroad and vehicular services.

If it be borne in mind that the Southern Pacific Company is seeking to engraft upon its railroad service, controlled by a foreign charter and over which the Railroad Commission has but limited control, a service that can be lawfully exercised only under local franchise grants, the intention of the legislature is easily discerned. The general terms employed in the statute must give way for the operation of the legislative intent (*People* v. *Ventura Refining Co.*, *ante*, p. 286 [268 Pac. 347]). A local ferry operation is in no proper sense a railway operation as it may and usually does exist independent· of it. The carriage by water to bridge the gap between the interrupted termini is but an incident to the railway transportation, a projection of its road over intervening waters. Such ferriage is merged into the railway transportation and is in no proper sense an entity or process resting upon its own independent foundation as is the case in commerce upon the inland waters, whether by ferry or other craft. This was the holding of this court in the case of *Southern Pac. Co.* v. *Richardson*, 181 Cal. 280 [184 Pac. 3], respecting the creek route ferry itself.

Indeed, in *Wheeler* v. *S. F. & A. R. Co.*, 31 Cal. 46, 64 [89 Am. Dec. 147], speaking of this identical subject, Justice Sawyer said: "It is one thing to build and own a line of steamers to some foreign country, or some distant port, carrying on a wholly distinct and independent business entirely foreign to the objects of a railroad corporation, which might just as well, and a great deal better, be transacted by some other company organized for the purpose; and quite another, to own and control a steamboat for crossing

rivers and bays which lay in the line of the road, and the use of which is convenient, proper and necessary to a successful accomplishment of the objects for which the road is built and operated." This statement would be equally true if it had inserted therein the words "port" or "or between local ports or points." See, also, *Wheeler* v. *S. F. & A. R. Co., supra.* This distinction between these two classes of service has been recognized many times in other jurisdictions (*The Maverick*, 16 Fed. Cas. No. 9316, p. 1186, 1 Sprague, 23; *Fitch* v. *New Haven etc. R. R. Co.*, 30 Conn. 38; *St. Clair Co.* v. *Interstate Transfer Co.*, 192 U. S. 454, 467 [48 L. Ed. 518, 24 Sup. Ct. Rep. 300, see, also, Rose's U. S. Notes]).

It should be noted in passing that the legislature in 1917 (Stats. 1917, p. 429) struck from section 3643 of the Political Code the following words: " . . . and also any boat employed as a part of the system of a railroad for the transfer of passengers and freight, plying at regular and stated periods between two points" (Stats. 1885, p. 93), thus showing that for purposes of taxation at least the statute has made the very distinction suggested in the cause before us.

We are thus irresistibly led to the conclusion that the boat service existing between San Francisco and Alameda in the year 1923 was not a service by "vessels" operating between points exclusively on the inland waters of this state within the meaning of said proviso.

This conclusion, of course, does not impair the authority of the Railroad Commission over railways and boats that are a part of them derived from other sources. The said amendment of 1923 is simply inapplicable to railway service and thereby inapplicable to boats or vessels used exclusively therein. We are thus resting our conclusion upon uncontestable grounds and are not required to declare a distinction between passenger and commodity transportation when admittedly carried by vessels subject to the act.

The order of the Railroad Commission dismissing the proceeding instituted to determine the status of said operation is in excess of the jurisdiction of said Commission and should be annulled.

Rehearing denied.

All the Justices concurred.