[No. F009783. Fifth Dist. Mar. 22, 1989.]

SUTCO CONSTRUCTION COMPANY, INC., et al., Plaintiffs and Respondents, v.
MODESTO HIGH SCHOOL DISTRICT et al., Defendants and Appellants.

### COUNSEL

Kronick, Moskovitz, Tiedemann & Girard and P. Addison Covert for Defendants and Appellants.

Kroll, Loeffler & Waggoner and James J. Kroll, Jr., for Plaintiffs and Respondents.

### OPINION

**BEST, Acting P. J.**—Appellants Modesto High School District, Modesto City School District, Empire Union School District and Stanislaus Union School District (Districts or appellants) appeal from a peremptory writ of mandate in favor of respondents Sutco Construction Company, Inc. (Sutco), Steven Paul Zagaris Development Company (Zagaris), and Vintage Faire Development Company, Inc. (Vintage Faire), (Developers), commanding the school districts to set aside prior impositions of school facility fees and refund all fees collected from respondents Sutco and Zagaris, and to cease further assessments pursuant to City of Modesto Ordinance No. 2438-C.S.

### STATEMENT OF FACTS

On July 15, 1986, the City of Modesto adopted Ordinance No. 2438-C.S., entitled "School Site and Facility Fees," for the express purpose of providing an "additional source of revenue for school site acquisition and improvement and buildings in the school districts so that complete school sites and facilities can be provided." Section 3 of the ordinance, entitled "Effective Date," states, "This ordinance shall go into effect and will be in full force and operation from and after sixty (60) days after its final passage and adoption." Pursuant to this provision, the ordinance became operative on September 13, 1986.

Section 8-1.203 of the local ordinance, entitled "Fees: Application" provides: "The fees imposed pursuant to this article shall be applicable to every

new dwelling unit or mobile home space constructed or installed in the City of Modesto."

On September 18, 1986, chapters 887 and 888 of the Statutes of 1986 (the 1987 school facilities law) were approved and signed into law in California. The law became operative on January 1, 1987. Uncodified section 7 of chapter 887 discusses the need for a "comprehensive school facilities finance program":

"The Legislature finds and declares as follows:

"(a) Many areas of this state are experiencing substantial development and population growth, resulting in serious overcrowding in school facilities.

"(b) Continued economic development requires the availability of the school facilities needed to educate the state's young citizens.

"(c) In growing areas of this state, the lack of availability of the public revenues needed to construct school facilities is a serious problem, undermining both the education of the state's children and the continued economic prosperity of California.

"(d) For these reasons, a comprehensive school facilities finance program based upon a partnership of state and local governments and the private sector is required to ensure the availability of school facilities to serve the population growth generated by new development.

"(e) The Legislature therefore finds that the levying of appropriate fees by school district governing boards at the rates authorized by this act is a reasonable method of financing the expansion and construction of school facilities resulting from new economic development within the district." (Stats. 1986, ch. 887, § 7, p. 3080.)

Whereas the authority for the imposition of developer fees by local ordinance had been pursuant to the "police power of the City of Modesto" (Ord. No. 2438-C.S., § 8-1.201., subd. (5)), the 1987 school facilities law authorized assessments only as specified by Government Code section 53080: "(a) The governing board of any school district is authorized to levy a fee, charge, dedication, or other form of requirement against any development project, as defined in Section 65928, for new construction within the boundaries of the district, for the construction or reconstruction of school

facilities, subject to any limitations set forth in Chapter 4.9 (commencing with Section 65995) of Division 1 of Title 7."

The authority to require Developers to pay school fees was limited by Government Code section 65995,[1] subdivision (a), which provides that except for fees specifically authorized by Government Code section 53080 (or certain temporary facility fees pursuant to Gov. Code, § 65970 et seq.) no fees may be levied by a local agency.

Government Code section 65995, subdivision (c), however, provides an exception to the elimination of local fees in subdivision (a): "Subdivision (a) does not apply during the term of any contract entered into between a subdivider or builder and a school district, city, county, or city and county,

---

[1] Government Code section 65995 provides: "(a) Except for a dedication or fee, or both, required under Section 53080, or pursuant to Chapter 4.7 (commencing with Section 65970), no fee, charge, dedication, or other form of requirement shall be levied by the legislative body of a local agency against a development project, as defined by Section 65928, for the construction or reconstruction of school facilities.

"(b) In no event shall the amount of any fee, charge, dedication, or other form of requirement, as described in subdivision (a), including the amount of fees to be paid or the value of land to be dedicated, or both, under Chapter 4.7 (commencing with Section 65970), exceed the following:

"(1) One dollar and fifty cents ($1.50) per square foot of covered or enclosed space, in the case of any residential development. . . .

"(2) Twenty-five cents ($0.25) per square foot of covered or enclosed space, in the case of any commercial or industrial development. No fee, charge, dedication, or other form of the requirement may be levied by any school district governing board upon any commercial or industrial development unless and until the governing board has first made the finding that the location and amount of land to be dedicated or the amount of fees to be paid, or both, shall bear a reasonable relationship and be limited to the needs of the community for elementary or high school facilities and shall be reasonably related and limited to the need for schools caused by the development.

"(3) The amount of the limits set forth in paragraphs (1) and (2) shall be annually increased according to the adjustment for inflation set forth in the statewide cost index for class B construction, as determined by the State Allocation Board at its January meeting.

"(c) Subdivision (a) does not apply during the term of any contract entered into between a subdivider or builder and a school district, city, county, or city and county, whether general law or chartered, on or before the effective date of this chapter that requires the payment of a fee, charge, or dedication for the construction of school facilities as a condition to the approval of residential development. In addition, any development project for which a final map was approved and construction had commenced on or before September 1, 1986, is subject to only the fee, charge, dedication, or other form of requirement prescribed in any local ordinance in existence on that date and applicable to the project.

"(d) The Legislature finds and declares that the subject of the financing of school facilities with development fees is a matter of statewide concern. For this reason the Legislature hereby occupies the subject matter of mandatory development fees and other development requirements for school facilities finance to the exclusion of all local measures on the subject.

"(e) Nothing in this section shall be interpreted to limit or prohibit the use of Chapter 2.5 (commencing with Section 53311) of Division 2 of Title 5 to finance the construction or reconstruction of school facilities."

whether general law or chartered, on or before the effective date of this chapter that requires the payment of a fee, charge, or dedication for the construction of school facilities as a condition to the approval of residential development. In addition, any development project for which a final map was approved and construction had commenced on or before September 1, 1986, is subject to only the fee, charge, dedication, or other form of requirement prescribed in any local ordinance in existence on that date and applicable to the project."

Since January 1, 1987, up to the present time, respondents Sutco and Zagaris have been assessed developer fees pursuant to the local ordinance under the alleged authority of Government Code section 65995, subdivision (c). Fees have been paid under written protest as required by Government Code section 65913.5, subdivision (a).

All of the properties owned by Developers and subject to the assessments challenged here are part of development projects for which final parcel maps had been approved and construction commenced on or before September 1, 1986.

## DISCUSSION

■■■ Appellants contend that the local ordinance was in "existence" and "applicable" to the subject projects as of September 1, 1986. Respondents argue that the local ordinance had no force and effect until its operative date of September 13, 1986, and therefore cannot apply as an exception authorized by Government Code section 65995, subdivision (c).

It is this court's task to interpret Government Code section 65995 and to apply Ordinance No. 2438-C.S. in the context of the 1987 school facilities law, mindful of the Legislature's intent in enacting that law.

### I.

### WAS THE TRIAL COURT'S FINDING THAT RESPONDENTS HAD NO ADEQUATE REMEDY AND WERE THEREFORE ENTITLED TO A PEREMPTORY WRIT OF MANDATE ERRONEOUS?

■■■ Appellants question whether mandate is an appropriate remedy. A writ of mandate may be issued "to compel the performance of an act which the law specially enjoins, . . ." (Code Civ. Proc., § 1085.) The writ will issue where no "plain, speedy, and adequate remedy, in the ordinary course of law" is available. (Code Civ. Proc., § 1086.) Appellants contend that

Developers had an adequate legal remedy available to them in the "form of a suit for refund of the fees paid" as authorized by case law and Government Code section 65913.5.

Here, there is no dispute concerning the facts. The only issue is whether the provisions of Government Code section 65995, as a matter of law, allow the imposition of school facilities fees on Developers. If they do not, the Districts are under a legal duty to refund fees to Developers and may be directed to perform that duty by writ of mandate. The absence of another adequate remedy was determined by the trial court when it granted the alternative writ. (*W. A. Rose Co.* v. *Municipal Court* (1959) 176 Cal.App.2d 67, 74 [1 Cal.Rptr. 49]; *Mannheim* v. *Superior Court* (1970) 3 Cal.3d 678, 686 [91 Cal.Rptr. 585, 478 P.2d 17].)

■ The question of the availability of an adequate remedy is ordinarily one of fact, largely within the discretion of the court in which the writ is sought. (8 Witkin, Cal. Procedure (3d ed. 1985) Extraordinary Writs, § 44, p. 679, § 102, p. 740.) "On appeal from the decision of that court either granting or denying the writ, its determination will not be disturbed in the absence of a showing of abuse of discretion." (*W. A. Rose Co.* v. *Municipal Court, supra,* 176 Cal.App.2d 67, 74.)

■ Since adequacy is a question of fact, a court may find that circumstances make the ordinary action an unsatisfactory remedy. In *Lockhart* v. *Wolden* (1941) 17 Cal.2d 628, 633 [111 P.2d 319], mandamus was granted to allow a tax exemption. The ordinary remedy of payment of the tax and suit to recover was found inadequate because of the numerous taxpayers involved and the probability of a multiplicity of suits. Developers contend that a suit for refund is inadequate in that appellants continue to assess fees on projects under construction as of September 1, 1986, and threaten further assessments; therefore, any suit to recover for fees already paid is an incomplete remedy. The trial court obviously agreed with Developers' argument and determined that a suit at law was not an adequate and speedy remedy. We find no abuse of discretion in this regard.

II.

WAS THE LOCAL ORDINANCE "APPLICABLE" TO RESPONDENTS' DEVELOPMENT PROJECTS AS OF SEPTEMBER 1, 1986, WITHIN THE MEANING OF GOVERNMENT CODE SECTION 65995?

■ The crux of appellants' argument is that the terms of Government Code section 65995, subdivision (c), encompass the local ordinance, thereby

allowing the assessment of school facilities fees on Developers' projects. The parties agree that the ordinance was "in existence" as of September 1, 1986, and only disagree as to whether, under the terms of the statute, the ordinance can be "applicable" before its operative date. We address this narrow inquiry here.

■ "Interpretation and applicability of a statute or ordinance is clearly a question of law." (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 242, p. 247.) It is the duty of an appellate court to make the final determination from the undisputed facts and the applicable principles of law. (*Jongepier* v. *Lopez* (1983) 142 Cal.App.3d 535, 538 [191 Cal.Rptr. 131].)

■ Where the statute is clear, the "plain meaning" rule applies. The Legislature is presumed to have meant what it said, and the plain meaning of the language governs. (*Great Lake Properties Inc.* v. *City of El Segundo* (1977) 19 Cal.3d 152, 155 [137 Cal.Rptr. 154, 561 P.2d 244].) ■ When the plain meaning of a statute is not clear, a court may employ one or more canons of statutory interpretation to aid in ascertaining the meaning intended by the Legislature.

We turn to the rules of statutory construction to aid in the interpretation of Government Code section 65995. ■ The most fundamental rule of construction is that a statute must be interpreted to effectuate the purpose of the law. (*Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 918 [80 Cal.Rptr. 89, 458 P.2d 33]; *Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].)

■ To determine legislative intent, the first step is an examination of the words themselves. (*People* v. *Knowles* (1950) 35 Cal.2d 175, 182 [217 P.2d 1], cert. den. 340 U.S. 879 [95 L.Ed. 639, 71 S.Ct. 117].) We must construe the statute "according to the context and the approved usage of the language; . . ." (Code Civ. Proc., § 16.) Effect must be given to the words according to their usual, ordinary import. (*Merrill* v. *Department of Motor Vehicles, supra,* 71 Cal.2d 907, 918; *In re Alpine* (1928) 203 Cal. 731, 737 [265 P. 947, 58 A.L.R. 1500].) (8) Significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose. (*Select Base Materials* v. *Board of Equal. supra,* 51 Cal.2d 640, 645.)

■ With these principles in mind, we consider the meaning of the words "applicable to the project." "Applicable" is defined as, "Fit, suitable, pertinent, or appropriate." (Black's Law Dict. (4th ed. 1968) p. 127.) An example of usage of the term "applicable" is given as follows: "When a

constitution or court declares that the common law is in force in a particular state so far as it is *applicable,* it is meant that it must be applicable to the habits and conditions of the community, as well as in harmony with the genius, the spirit, and the objects of their institutions. Wagner v. Bissell, 3 Iowa 402." (*Ibid.*)

"Applicable" here appears to specify those projects contemplated within the local ordinance which are subject to the fees or other requirements prescribed by that ordinance. The ordinance expressly enumerates the types of projects to which it applies. "The fees imposed pursuant to this article shall be applicable to every new dwelling unit or mobile home space constructed or installed in the City of Modesto." (Ord. No. 2438-C.S., § 8-1.203.) In other words, "applicable" describes the types of projects subject to the terms of the ordinance rather than the status of the ordinance as an enforceable law.

This interpretation is supported by the fact that the words "on that date" (Sept. 1, 1986) follow the phrase "in existence" rather than "applicable." Certainly, if the Legislature had intended the word "applicable" to mean "operative," as argued by Developers, it would have described the term according to some date. It could easily have phrased Government Code section 65995, subdivision (c), to read: ". . . subject to only the fee, charge, dedication, or other form of requirement prescribed in any local ordinance *in existence and applicable to the project on that date.*" Instead, "in existence" and "applicable" are separated by the reference to September 1, 1986. Construing the word "applicable" as we have here does not require a qualifying date. An ordinance can apply by its terms to a specific subject without any reference to the date upon which it has any force and effect as law.

Respondents argue that an ordinance cannot, by definition, be "applicable" until it becomes operative. Respondents contend that Districts' position "that the Local Ordinance was somehow applicable to developers' projects prior to its operation at law is illogical and nonsensical and renders the phrase 'and applicable to the project' meaningless by itself and nothing more than synonymous with the mere existence of the Local Ordinance." Developers' reasoning in concluding that the "existence" of the ordinance is synonymous with its "applicability" is unclear. The exemplar use of "applicable" in Black's Law Dictionary clearly distinguishes between a law being "in force" and "applicable." Obviously, a law in full force and effect may not be "applicable" for reasons having nothing to do with its operative date.

Developers argue that the ordinance was neither effective nor operative until September 13, 1986, and at the same time contend the distinction

between the words "effective" and "operative" is illustrative here; "The districts' argument lacks any merit because in order for a statute to be applicable it must be operative and effective."

First of all, if the Legislature had intended the word "applicable" to mean operative or effective, it could have used these terms. In Government Code section 65995, subdivision (c), the sentence previous to that under scrutiny here makes reference to an "effective date."

■ There is no dispute that the law distinguishes between an effective date and an operative date. Usually, the effective date and operative date are the same, although the power to enact laws includes the power to fix a future date on which the act will become operative. (*Estate of Rountree* (1983) 141 Cal.App.3d 976, 980 [192 Cal.Rptr. 152].) The consequences attaching to an "effective" date and to an "operative" date are not the same. ■ The local ordinance was adopted on July 15, 1986, and slated "to go into effect and be in full force and operation from and after sixty (60) days. . . ." It is not clear whether appellants argue that the date of the enactment or adoption of the ordinance and the date it became "in full force and operation" comprise an "effective" date and an "operative" date with distinct consequences. In any event, the distinction, if there is one, seems of little import here.

Respondents cite *Johnston v. Alexis* (1984) 153 Cal.App.3d 33, 41 [199 Cal.Rptr. 909], which explores this distinction and finds that legislation can have practical legal consequences once effective, even in advance of an operative date. A class action filed by vehicle owners whose registrations expired on December 31, 1981, challenged increased fees levied pursuant to legislation which became effective September 17, 1981, and operative January 1, 1982. Because the fees were required to be paid in advance of the operative date, plaintiffs argued they were collected unlawfully. The appellate court held that the Department of Motor Vehicles properly collected increased fees, reasoning that payment was made in advance for the following year and that vehicles registered after December 31, for essentially the same year, would be assessed increased fees: "A contrary conclusion would mean that, even though increased fees for the registration year January 1, 1982, through December 31, 1982, were 'operative' on January 1, 1982, owners timely renewing vehicle registrations subject to that registration year would be exempt from payment of the increased fees, whereas those operating vehicles for the first time on January 1, 1982, and assigned the same registration year as plaintiffs, would pay them." (*Id.* at p. 42.)

That reasoning may assist here. Developers argue that "applicable" means both "effective" and "operative" and that the ordinance could not

apply until it had "force and effect on respondents as law . . . ." With this interpretation, it would appear the local ordinance would not become "applicable" until the individual developer made application for a building permit, and therefore became liable for fees.[2] Indeed, because the date of application for a building permit is the pertinent one in enforcing the ordinance, it seems the Legislature logically tied Government Code section 65995 to the *existence* of a local ordinance rather than some operative date. It is, after all, the building permit which triggers the need for facilities fees to finance improvements necessitated by development. This analysis is consistent with the general rule that a builder must comply with the laws which are in effect at the time a building permit is issued, including the laws which were enacted after application for the permit. (*Brougher v. Board of Public Works* (1928) 205 Cal. 426, 435 [271 P. 487]; *Russian Hill Improvement Assn.* v. *Board of Permit Appeals* (1967) 66 Cal.2d 34, 39-40 [56 Cal.Rptr. 672, 423 P.2d 824].)

Further, developers whose projects fit within the provisions of Government Code section 65995 as read by respondents would be exempt from all school facilities fees implemented after January 1, 1987, while developers whose projects had not commenced construction as of September 1, 1986, would be liable for such assessments even though application for building permits occurred at the same time. This cannot have been the intent of the Legislature. ■ "[S]tatute[s] must be given a fair, reasonable and common sense interpretation and one that is practical rather than technical and that leads to a wise policy rather than to mischief or an absurdity [citation]." (*People* v. *Hinojosa* (1980) 103 Cal.App.3d 57, 64 [162 Cal.Rptr. 793].)

■ When interpreting a statute, if its provisions are unclear, its purpose is paramount. (*People v. Davis* (1981) 29 Cal.3d 814, 828 [176 Cal.Rptr. 521, 633 P.2d 186].) It is the duty of this court to construe Government Code section 65995 with reference to the purposes sought to be served and the public policy underlying the legislation. (*Golden Gate Ferry Co.* v. *Railroad Com.* (1928) 204 Cal. 305, 312 [268 P. 355].) An important aid in this regard is the legislative history of the statute. (*Osgood* v. *County of Shasta* (1975) 50 Cal.App.3d 586, 589 [123 Cal.Rptr. 442].)

■ In 1976 the League of California Cities and other associations joined forces to develop specific legislation authorizing the imposition of fees, charges, land acquisitions, etc., by local government units for ultimate use by the school districts in alleviating the impact of rapid student popula-

---

[2]Section 8-1.206 of the local ordinance provides that, "All fees described in Section 8-1.205 shall be collected *prior to issuance of any building permit.*"

tion growth. This effort resulted in passage of Senate Bill No. 201 (Gov. Code, § 65970 et seq.) in September 1977. (See *Trent Meredith, Inc.* v. *City of Oxnard* (1981) 114 Cal.App.3d 317, 320 [170 Cal.Rptr. 685].) The Legislature had declared that adequate school facilities should be available for children residing in new residential developments throughout the state. It found existing state law frequently could not be used to alleviate conditions of overcrowding in school facilities caused by new housing developments. Accordingly, the Legislature enacted the statutory scheme as a new and improved method of financing interim school facilities necessitated by new development. (62 Ops.Cal.Atty.Gen. 601, 606 (1979).)

The legislative history bearing on the 1986 revisions in the school facilities law is set forth, in part, above. Particular attention should be given paragraph (d) describing a comprehensive finance program "based upon a partnership of state and local governments . . . to ensure the availability of school facilities to serve the population growth generated by new development." (Stats. 1986, ch. 887, § 7.)

The 1987 school facilities law grants authority to school district governing boards to impose developer fees, subject to specified limits, and prohibits the imposition of other developer fees. (Gov. Code, §§ 53080, 65970-65979.) There is no blanket elimination of fees but rather a state-mandated program prohibiting cities from issuing building permits absent certification from the appropriate school district governing board that the development is in compliance with any developer fee requirement imposed by that governing board. (Legis. Counsel's Dig., Stats. 1986, ch. 887, No. 10 West's Cal. Legis. Service, p. 839; No. 5 Deering's Adv. Legis. Service, p. 132.)

The 1986 revisions in the school facilities law clearly establish the state's interest in the financing of school facilities with development fees. "For this reason the Legislature hereby occupies the subject matter of mandatory development fees and other development requirements for school facilities finance to the exclusion of all local measures on the subject." (Gov. Code, § 65995, subd. (d).) At the same time, the act unmistakably recognizes and permits local action. Whereas the legislation initiated in 1977 provided what has been described as a "stop-gap," "patchwork" measure to finance interim school facilities needs (*Candid Enterprises, Inc.* v. *Grossmont Union High School Dist.* (1985) 39 Cal.3d 878, 882 [218 Cal.Rptr. 303, 705 P.2d 876]), the 1986 revisions sought a comprehensive, long-term solution to financing the needs of local school districts. The legislative intent in either case is to alleviate overcrowding of local school facilities caused by new

residential development. The Districts' interpretation of Government Code section 65995 is consistent with that intent.

Government Code section 65995 exempts development projects well under way as of September 1, 1986, from all facilities fees levied by a school district governing board under the new legislation. Such projects are subject only to local fees "in existence" as of that date and "applicable to the project." In construing section 65995, the Legislative Counsel of California found the intent of the Legislature to "protect a development project evidencing significant progress from the imposition of additional, unanticipated costs." Developers would have their cake and eat it too, claiming an exemption from both school district fees under section 53080 and local fees assessed by the City of Modesto. The narrow purpose of Government Code section 65995 would not be furthered by immunizing respondents from all fees for the financing of school facilities. Only those fees authorized under the new legislation represent unanticipated costs which would unfairly interfere with the progress of previously funded projects.

Further, the regulatory scheme and system of exactions imposed by the state to standardize the solution to school problems would not be furthered by exempting respondents from all fees. As noted, some developers would be subject to fees after January 1, 1987, where others would not. Some developers would contribute to the problem of school overcrowding with impunity, while others would by law contribute also to the solution.

To interpret Government Code section 65995, subdivision (c), as urged by respondents allows Developers to avoid payment of school financing fees for all projects for which a map was approved and construction commenced as of September 1, 1986, regardless of when application for a building permit is made. Revenues potentially generated by hundreds of residences constructed in these developments would be completely lost. Developments contributing to population outbursts would be immune from any obligation to assist with financing for school facilities necessitated by these population increases. In our view, the Legislature could not have intended to deprive the schools of financing by shielding developers from *all* school facilities fees.

## Disposition

The judgment (writ of mandate) is reversed and the trial court is directed to enter its order denying the petition. Appellants to have their costs on appeal.

Ardaiz, J., and Brown (G. A.), J.,* concurred.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.