[No. D013821. Fourth Dist., Div. One. Mar. 23, 1992.]

CITY OF HIGHLAND, Plaintiff and Appellant, v.
COUNTY OF SAN BERNARDINO, Defendant and Appellant.

1178

COUNSEL

Brunick, Alvarez & Battersby, Marguerite P. Battersby and Amy Greyson for Plaintiff and Appellant.

Luce, Forward, Hamilton & Scripps, R. William Bowen, Charles A. Danaher, Jennings, Engstrand & Henrikson, Arlene Prater and Debra K. Maurer as Amici Curiae on behalf of Plaintiff and Appellant.

Alan K. Marks, County Counsel, Paul F. Mordy and Kevin Norris, Deputy County Counsel, for Defendant and Appellant.

Lloyd M. Harmon, Jr., County Counsel (San Diego), Diane Bardsley, Chief Deputy County Counsel, and Miriam Milich, Deputy County Counsel, as Amici Curiae on behalf of Defendant and Appellant.

## OPINION

**FROEHLICH, J.**—The City of Highland (City) sought a peremptory writ of mandate against the County of San Bernardino (County) to correct alleged errors in County's allocation of property taxes to City. The trial court issued a judgment granting the petition in part and denying it in part. Both City and County appeal the judgment, the totality of their appeals challenging all of the determinations made by the trial court.

A brief review of the system by which property taxes are allocated within a county is appropriate as a precursor to our specific analysis of the issues of this case. The property tax is the largest single source of tax revenue for local governments. (11 Cal. Practice, State and Local Taxation (1987) § 4, p. 4.) Property taxes levied and collected by counties are allocated among the various agencies within the county, including cities. (Rev. & Tax. Code, §§ 93, 95, 96, 97.5.) When a city is created in a previously unincorporated area of the county, and undertakes performance of governmental services previously performed by the county, a reallocation of some portion of the property tax from the county to the city is necessary. Government Code[1] section 56842 is designed to regulate this reallocation.

---

[1]All statutory references are to the Government Code unless otherwise specified.

The original procedure for reallocation, as adopted in 1985,[2] required three calculations: (1) a determination of the percentage of total county revenue available for general purposes constituted by the property tax (this percentage is called the "auditor's ratio"); (2) a determination of the "total cost" to the county of the services to be undertaken by the new city; and (3) a determination of the property tax to be allocated to the new city by multiplying the total cost of services to be undertaken by the property tax percentage. Thus, for instance, if property taxes constituted 60 percent of county revenues, and a new city were to absorb services which previously cost the county $1 million, the city would be entitled to $600,000 in county property tax revenues.

The formula for reallocation of property tax was modified in 1986 by amendment to section 56842.[3] In determining the percentage of total county revenue available for general purposes constituted by the property tax, "total amount of revenue available for general purposes" was defined to exclude three categories of restricted revenue. Similarly, the "total cost" to the county of services to be undertaken by the new city was modified to read "total net cost," and "total net cost" was then defined to exclude any services funded by the three restricted sources of funds. These three restricted sources, as set forth in section 56842, subdivision (c)(1), were: (A) revenue required by statute to be used for a specific purpose; (B) revenue levied to specifically offset the cost of particular services which do not exceed those costs; and (C) revenue received from the federal government required to be used for specific purposes.[4]

---

[2]Statutes 1985, chapter 541, which repealed former sections 54773 et seq. (the Knox-Nisbet Act) and sections 35000-35500 (Municipal Organization Act).

[3]Statutes 1986, chapter 956, section 1. The original form of the section as well as the section as amended in 1986 are set forth in 36B West's Annotated Government Code (1992 pocket supp.) section 56842, pages 93-95 (Deering's Ann. Gov. Code (1987) § 56842, p. 425).

[4]The present form of section 56842 through subdivision (c)(3), which is the source of the above paraphrasing, is fully set forth as follows:

"(a)  If the proposal includes the incorporation of a city, as defined in Section 56043, or the formation of a district, as defined in Section 2215 of the Revenue and Taxation Code, the commission shall determine the amount of property tax revenue to be exchanged by the affected local agency pursuant to this section.

"(b)  The commission shall notify the county auditor of the proposal and the services which the new jurisdiction proposes to assume within the area, and identify for the auditor the existing service providers within the area subject to the proposal.

"(c)  If the proposal would not transfer all of an affected agency's service responsibilities to the proposed city or district, the commission and the county auditor shall do all of the following:

"(1)  The county auditor shall determine the proportion that the amount of property tax revenue derived by each affected local agency pursuant to subdivision (b) of Section 93 of the Revenue and Taxation Code bears to the total amount of revenue from all sources, available

We attempt to state the apparent effect of this amendment as follows: The total cost to a county of services assumed by a new city was never reallocated to the city. The total cost was modified by application of the "auditor's ratio," which was the percentage derived by dividing total property taxes by the total revenue of the county. The 1986 amendment changed this calculation by deleting from both the denominator of the "auditor's ratio" and the sum of total costs of services those revenues and related costs which are funded by special and restricted revenues.

We have no controlling indication of the precise intent of the Legislature in modifying its allocation formula.[5] We simply note that the reallocation is now based upon application of a refined auditor's ratio to "total net cost" of services, rather than "total cost," but that "total net cost" is specifically defined in terms of modification of "total" by the three categories of

---

for general purposes, received by each affected local agency in the prior fiscal year. For purposes of making this determination and the determination required by paragraph (3), "total amount of revenue from all sources available for general purposes" means the total amount of revenue which an affected local agency may use on a discretionary basis for any purpose and does not include any of the following:

"(A)   Revenue which, by statute, is required to be used for a specific purpose.

"(B)   Revenue from fees, charges, or assessments which are levied to specifically offset the cost of particular services and do not exceed the cost reasonably borne in providing these services.

"(C)   Revenue received from the federal government which is required to be used for a specific purpose.

"(2)   The commission shall determine, based on information submitted by each affected local agency, an amount equal to the total net cost to each affected local agency during the prior fiscal year of providing those services which the new jurisdiction will assume within the area subject to the proposal. For purposes of this paragraph, 'total net cost' means the total cost which was funded by general purpose revenues of the affected local agency and excludes any portion of the total cost which was funded by any revenues of that agency which are specified in subparagraphs (A), (B), and (C) of paragraph (1).

"(3)   The commission shall multiply the amount determined pursuant to paragraph (2) for each affected local agency by the corresponding proportion determined pursuant to paragraph (1) to derive the amount of property tax revenue used to provide services by each affected local agency during the prior fiscal year within the area subject to the proposal."

[5]The 1986 Summary Digest of legislation helpfully indicates that one of the purposes of chapter 956 was to require "the county auditor to determine the amount of property tax revenue to be exchanged by the affected local agencies in a different manner and by requiring local agency formation commissions to follow a different procedure with regard to those calculations." City in its appellate brief advises that the original formula resulted in a windfall to new cities, because some of the services undertaken by the new city which had been funded at the county level by property taxes would be funded at the city level by other sources, such as fees for services or sales taxes. City supports this contention by providing copies of informal legislative materials, such as a letter dated February 13, 1986, from Illa Collin, Chairman of the Board of Supervisors of Sacramento County, to Baxter Culver, legislative advocate. The letter explains, and City contends, that the purpose of the amendment was to avoid this windfall. Since our interpretation of the effect of the amended section is not dependent upon our acceptance or rejection of any specific objective sought by the Legislature via the new amendment, we do not rely upon or cite these materials.

restricted revenues.[6] What the addition of "net" to the terminology means, of course, is the subject of dispute between the parties to this appeal, as discussed hereunder.

### PROCEDURAL BACKGROUND AND ISSUES PRESENTED

A petition for incorporation of City was filed with the San Bernardino Local Agency Formation Commission (LAFCO) on December 16, 1986. LAFCO in due course commenced "reorganization proceedings" to investigate and resolve the many practical and legal issues involved in the creation of a new city. As part of its investigation, LAFCO asked the County Auditor to calculate the "auditor's ratio," which is the percentage constituted by property tax revenues of all revenue free of spending restrictions. LAFCO also asked the County Administrative Officer to provide the "total net cost" of services which the new city would assume.

The respective county officers provided information indicating that the county's total net cost of such services was $682,448, that the auditor's ratio was 54 percent, and hence the property tax allocable to the new city would be $368,521. In reaching these figures the auditor's response was based upon the fiscal year 1985-1986; the calculation of "total net cost" of services was, however, based upon figures derived from the fiscal year 1986-1987.

Thereafter, during the year 1987 LAFCO as well as the county board of supervisors (acting as the "conducting authority") held public hearings to consider the incorporation. The formula for allocation of property taxes to the new city was presented and discussed at these hearings, and no objection to it was voiced. The incorporation was approved by popular vote of the affected citizens in November 1987, and the city was formally recognized as established in the supervisor's resolution of November 23, 1987. A part of that resolution was that "the distribution of property tax revenues to the City of Highland upon its incorporation from . . . County of San Bernardino [be] $368,521," and that such sum should "serve as the basis for computation of property tax revenues to be distributed to the City of Highland for Fiscal Year 1988-89."

---

[6]The formula for calculating the reapportionment of property taxes was reviewed and analyzed in an Attorney General's opinion entitled *Calculation of Property Tax Revenues* issued as opinion No. 88-603 on September 15, 1988 (71 Ops.Cal.Atty.Gen. 286 (1988).) In referring to the excluded revenues the opinion states: "Of particular significance is the fact that excluded from the calculations of section 56842 are funds required under state or federal law to be used for a specific purpose and funds received to offset certain costs of various services. These revenues will continue to be received by the transferring agency or begin to be received by the new city to the extent each furnishes the specified services. Neither is thus pertinent to a determination of what property tax revenues should be transferred between the two entities." (*Id.* at p. 290.)

Property tax funds were first distributed to City in the fiscal year 1988-1989, and the amount thereof was based upon the figure set forth in the supervisors' resolution increased by 16.29 percent. This increase represented the growth in assessed value of property within the City from 1986-1987 to 1987-1988. City first objected to the property tax determinations in May 1988. The supervisors declined to recalculate the property tax allocation, leading eventually to the filing by the City of the petition for writ of mandate.

City's claim of erroneous calculation of the property tax allocation was based upon several distinct factors:

1.    Total Net Cost Determination: A principal factor in the calculation of property tax to which the new city would be entitled was the determination by County of the total cost of services which would be shifted to City. County determined this total by excluding nondirect costs, such as overhead and support services. City claims that "total net cost" as set forth in the applicable statute should include all costs, both direct and indirect.

2.    Interest Income as Property Tax: When County calculated total property tax revenues it did not include interest earned on property taxes. The effect of this exclusion was to reduce the "auditor's ratio," because the interest income was nevertheless included in the calculation of total county revenues free from spending restrictions. This was error, City claims, because the interest on property tax should be treated as part of property tax.[7]

3.    Adjustment in Allocation for Increased Assessed Valuations: The first allocation of taxes from County to City was made for the fiscal year 1988-1989. The calculation of tax entitlement (by which the $368,521 figure was reached) was based upon fiscal year 1986-1987. The auditor increased the allocation by 16.29 percent, which represented growth in assessed value from 1986-1987 to 1987-1988. City claims the wrong year was used for the initial calculation, and that adjustments for increases in assessed values should have been made for 1986-1987 as well as 1987-1988.

In addition to the issues set forth above, the superior court was required to resolve affirmative defenses raised by County, all based upon City's failure

---

[7]The original calculation of the auditor's ratio also excluded from the numerator "supplemental property taxes." Since the numerator was constituted of "property taxes" and the denominator in this calculation was made up of all unrestricted county revenues, such exclusion, like that of the exclusion of interest, resulted in a lowered auditor's ratio. Supplemental property taxes are those additions to property tax resulting from a recalculation of tax when an assessable event, such as a change in ownership, occurs. After filing of the petition, County reviewed its practices and determined it could predict with reasonable certainty the amount of revenue from supplemental property taxes, and hence it had erred in excluding such sums from its calculation of the auditor's ratio. This issue, therefore, was conceded and is not an issue on appeal.

to challenge the allocation calculations made by County when such calculations were presented to the various involved governmental agencies (LAF-CO and the board of supervisors) and to the citizens as part of the incorporation election. These defenses were characterized as estoppel, laches and failure to exhaust administrative remedies.

## Discussion

1. *In the Calculation of "Total Net Cost" of Services to Be Reallocated, Indirect Costs Must Be Included.* As indicated above, the formula for allocation of property taxes from a county to a new city is based upon a percentage called the "auditor's ratio" which is then applied to a total sum of property taxes previously utilized by the county in providing services to the area now incorporated as a city. The statutory language for computing this total sum, contained in section 56842, subdivision (c)(2), requires the application of the auditor's ratio to the "amount equal to the total net cost to [the county] during the prior fiscal year of providing those services which the new jurisdiction will assume within the area subject to the proposal."

The positions of the parties with respect to the calculation of this sum can be stated simply (although the statutory framework is admittedly more complex). County's position is that the costs which should be reallocated to City are those which County will save by reason of the assumption by City of the service in question. An example cited by County is the provision for law enforcement services. When City takes over these services, direct expenditures such as the cost of police cars and patrolmen will be saved by County. County will not save its "indirect" costs, however, such as any portion of the salary of the sheriff or of the personnel of his administrative office. Since these indirect costs will not be saved, County argues the tax revenues represented thereby should not be reallocated to City.

City's argument is based upon the wording of the statute. As originally written, section 56842 referred to "total cost" of services to be shifted. The amendment in 1986 changed this wording to "total net cost," but City contends the "net" in this phraseology was meant to exclude the new specific exclusions contained, postamendment, in subdivisions (c)(1)(A), (B) and (C). Relying on dictionary definitions of "total," City argues that "total" means all, or everything, and brooks no exclusions. If the Legislature had meant to exclude overhead or indirect costs, City argues, it could easily have said so.

The superior court denied City's petition for recalculation and supported County's determination of "total net cost" as to its exclusion of overhead and

indirect costs. It did so upon the conclusion that "inclusion of total direct and indirect expense . . . applies only to incorporations where the new city petitions were filed after January 1, 1987."[8]

We conclude the court erred in this determination. Section 57384 deals with the problem of costs of services in the new city in the balance of the fiscal year of its incorporation, and provides that such services will continue to be furnished by the county. Subdivision (b) of section 57384 then provides a means whereby the new city can reimburse the county for such costs over a period of years. The reimbursement so identified is the "net cost of services" to the county, and "net cost of services" is defined to mean "the total direct and indirect expense to the county of providing services, as determined pursuant to paragraph (2) of subdivision (c) of Section 56842." This provision for reimbursement of the county is specifically stated in section 57384, subdivision (b) to apply only to incorporations filed on or after January 1, 1987.

The amendment to section 57384 (which provided for reimbursement to the county for tail-end fiscal year expenses incurred on behalf of a city filing for incorporation from and after Jan. 1, 1987) was adopted in the same legislative session as the amendment to section 56842 (which added the phrase "total net cost" and also defined total revenues as excluding the three categories of revenues for specific purposes defined in subdivisions (c)(1)(A), (B), and (C)).[9] That the legislators were cognizant of a relationship between the two sections is evident from their reference in section 57384 to the concept of "expense . . . of providing services" as defined in section 56842. It does not follow, however, that the definition of costs to be reimbursed as "total direct and indirect expense," which is the wording of section 57384, has any relationship to or effect on the phrase "total net cost" as defined in section 57384. The section 57384 definition has to do with a part of the formula for dividing property tax *revenues*. The section 56842 definition, on the other hand, pertains to reimbursement of *costs* incurred. There is similarly no logic in assuming that the time condition imposed by section 57384 (as applicable only to incorporations from Jan. 1, 1987) has any effect upon the interpretation of section 56842.

---

[8]The court's complete statement, as contained in the formal statement of decision, was: "The 'total net cost' of providing services was properly determined by Respondent County without consideration of indirect expense to the County of providing governmental services, because Government Code section [57384, subdivision (b)], which specifically requires the inclusion of total direct and indirect expense to be considered, applies only to incorporations where new city petitions were filed after January 1, 1987. This provision does not apply to the City of Highland, which was incorporated prior to that date." (In its statement of decision the court, apparently inadvertently, referred to section 57348 instead of 57384, a mistake referenced in City's opening brief and not disputed in responding paperwork).

[9]Section 56842 was amended by Statutes 1986, chapter 956; section 57384 was amended by Statutes 1986, chapter 700.

Counsel for City earnestly argue that a review of legislative history supports their interpretation of section 56842. Except for the communications of governmental lobbyists, one of which we have referenced in footnote 3, *ante,* and do not view as persuasive legislative history, we find nothing specifically on point. ■ We must rely, therefore, upon general principles of statutory interpretation, including the admonition that words in a statute are construed in accordance with their usual and ordinary meaning (*Estate of Richartz* (1955) 45 Cal.2d 292, 294 [288 P.2d 857]), and "[w]here the statute is clear, the 'plain meaning' rule applies [and] [t]he Legislature is presumed to have meant what it said . . . ." (*Sutco Construction Co.* v. *Modesto High School Dist.* (1989) 208 Cal.App.3d 1220, 1228 [256 Cal.Rptr. 671].)

■ Before its amendment in 1986, section 56842 referred to the property tax amounts to be reallocated to cities as "total cost." An apparent principal purpose of the 1986 amendment was to identify certain revenues which were special in the sense that they were earmarked for special use by the governmental entity. This new and refined definition was utilized for two purposes: (1) to identify the total revenue available for general purposes (the denominator in the "auditor's ratio") (§ 56842, subd. (c)(1)) and (2) as a reduction in total costs which were funded by the County prior to incorporation (the numerator in the ratio) (§ 56842, subd. (c)(2)). The term "total net cost" is not only introduced by the amendment in 1986, but it is also *defined.* It "means the total cost which was funded by general purpose revenues of the [county] and excludes any portion of the total cost which was funded by any revenues of [the county] which are specified in subparagraphs (A), (B), and (C) of paragraph (1)." There is no reference to a distinction between direct and indirect costs, or to direct expenditures and overhead. The explicit definition is that cost will be measured by "total," except for the specific A, B and C categories. County's argument that it should not be deprived of tax revenues when it does not experience a tax savings has a ring of equity to it. There is nothing in the statute, however, to support the position.

■ Also, there is nothing in section 56842 to suggest that it is not to be applicable to all payments coming due following its effective date. We note that sections 56842 and 57384 have distinct and several purposes. The former defines the amount of property tax to be shifted from county to city in the first full fiscal year of the city's existence. The latter deals with reimbursement of counties by new cities for costs incurred by a county on a city's behalf in the fractional fiscal year following its incorporation. The phrase "net cost of services" in section 57384 is defined by reference to section 56842, subdivision (c)(2), which is the same definition utilized for "total net cost" as defined in the latter section. This does not suggest, we

believe, that the effective date of the reimbursement provisions of section 57384 should have any bearing on the effective date of the new definitions of section 56842. It can be argued, however, that since "net cost of services" is the same as "total net cost," and "net cost of services" in section 57384 is specifically defined as "total direct and indirect expenses," the reference to "total net cost" in section 56842 should also be deemed to include direct and indirect expenses.

Apparently, at least if we accept County's argument, there is some loss of efficiency when new cities are formed which take over some of the functions formerly performed by the county. The county cannot save the total amount the new city incurs in new expenses. Assuming this to be so, the formation of new cities will create a stress in the governmental administration and allocation of the property tax. If the city receives its full entitlement, based upon the services it has assumed, the county will suffer a net loss because it will be unable to effect savings equal to the transfer of tax revenue. If the county reserves that portion of the tax which it cannot save through transfer of services, the city will not receive enough to cover both direct and indirect costs of the services assumed. Accepting this argument,[10] we must assume that the Legislature faced a difficult value judgment in the framing of its reallocation formula. Although perhaps the statute could have been clearer, or some authentic legislative history created to permit a more accurate construction of the statute, the Legislature nonetheless spoke directly. Its statute requires reallocation of revenues based upon "total" cost. This requirement does not permit refinement for consideration of overhead. The Legislature has assigned any loss in the reallocation process to the county. The trial court's ruling on this issue, therefore, must be reversed.

2. *Interest Income on County Invested Funds Is Not "Property Tax" for the "Auditor's Ratio" Computation.* Restating previously discussed principles: The amount of property tax to be allocated to City from County is a percentage of the cost of services transferred from County to City. The percentage, called the "auditor's ratio," is derived by using total property tax revenue as the numerator and the total amount of revenue from all sources

---

[10]For purposes of discussion we accept the thesis that County cannot reduce its overhead and indirect costs in parity with the division of its expense for direct services. We note, however, that the "proof" of this proposition in view of the record before us is very slim. Calculations were provided by an administrative analyst in the office of the county administrative officer of San Bernardino and by the Auditor/Controller-Recorder of the County of San Bernardino which tended to support the assertion in a general manner. No finding of fact as to this underlying issue was, however, made by the superior court. We apprehend that proof of this proposition with any particularity would be difficult, and hence verification of County's identification of expenditures as either direct or indirect, were we to affirm the trial court's decision, would pose a most difficult question of factfinding.

available for general purposes (less specific deductions) as the denominator. (§ 56842, subd. (c)(1).) Property taxes are collected, for the most part, in two installments: the first in December and the second in April of each fiscal year. The bunching of this revenue results in "idle cash" available to the county for some period of time. These funds earn interest from the time of their collection until the time of use by the county. The treatment of this interest in the calculation of the auditor's ratio is an issue in dispute between County and City. The interest income derived from property tax revenues is acknowledged by both parties to be "revenue . . . available for general purposes" and hence includable in the denominator of the auditor's ratio. If such interest income is part of the property tax, it should also be includable in the numerator. Inclusion in the numerator of such income will increase the percentage derived from the ratio, thus allocating more property tax revenues to City.

County, in its calculation of the auditor's ratio, did not include interest income from idle funds derived from property taxes in the numerator of the auditor's ratio. ■ City contends that interest takes the character of the fund upon which it is earned, should be classified as property tax, and should be included in the numerator of the auditor's ratio. The superior court agreed with City, stating in its statement of decision that "Interest income generated by property taxes must be included as property tax revenue for purposes of calculating the property tax transfer to . . . City." We believe the court erred in this ruling. As with our decision concerning the definition of "total net tax," we base our conclusion on the literal wording of the controlling statute, and not upon any speculation as to what might be the most equitable result to either City or County.

Section 56842, subdivision (c)(1) states that the numerator of the auditor's ratio is to be composed of "property tax revenue." Once property tax has been collected, the subsequent disposition of such revenue by a county can have no effect upon the amount collected. While it is true that penalties and interest charged to a taxpayer for delinquent payment of taxes are classifiable as "property tax" (*City of Los Angeles* v. *County of Los Angeles* (1983) 139 Cal.App.3d 999, 1003-1004 [189 Cal.Rptr. 129]), once collection has been achieved the subsequent disposition of the funds in a way that earns interest does not, in our view, enhance the amount of "property tax" that has been collected.

We find City's arguments on this issue to be inapposite. City first refers to Revenue and Taxation Code section 93, subdivision (b), and notes that this section (in combination with Rev. & Tax. Code, § 4653.6 et seq.) requires allocation of penalties and interest earned on delinquent property taxes to the

county general fund. Since this provision does not mention interest earned on property taxes generally, City argues the provision must have intended that such interest be classified as "property tax" and hence be available for use as such in the auditor's ratio.

This argument is unpersuasive. The 1989 amendment to Revenue and Taxation Code section 93, which mandated allocation of interest and penalties to the county general fund, was adopted specifically to nullify the ruling of *City of Los Angeles*.[11] Had any authority prior to 1989 dealt with the classification of interest on idle funds derived from property tax, the 1989 amendment and its omission to deal with such "general" interest might be deemed a clue to the Legislature's intent with respect to such interest. There was, however, no such authority. No one has cited us any case classifying interest on collected county funds as anything other than county general funds. That first the courts and then the Legislature gave attention to classification of interest collected from a taxpayer on delinquent taxes, is no indication in our opinion of any intention as to the classification of general interest.

City's second argument is based upon article XIII B of the California Constitution, adopted as part of the "Gann Initiative" (Prop. 4, Nov. 6, 1979). Section 8, subdivision (c)(2) of article XIII B defines "proceeds of taxes" to include "investment of tax revenues." If article XIII B had anything to do with the allocation of property tax between cities and counties, its aforementioned subsection would be instructive in our analysis of section 56842, subdivision (c)(1). The subject constitutional article does not, however, relate in any way to the apportionment statutes of the Government Code. It was adopted to impose spending limitations on the growth of governmental appropriations. (*County of Placer* v. *Corin* (1980) 113 Cal.App.3d 443, 446 [170 Cal.Rptr. 232].) The inclusion of interest from investment of tax revenues as part of "proceeds of taxes" was designed to tighten the limitation on spending.[12]

We find, therefore, that neither language in the Constitution nor in the Revenue and Taxation Code lends meaning to the words used to define the auditor's formula, as contained in section 56842. We therefore give the Government Code language its literal and commonly understood meaning,

---

[11]Section 2 of Statutes 1989, chapter 1230 provided: "The Legislature finds and declares that property tax delinquency penalties, and accrued legal interest paid on judgments for the recovery of unpaid property taxes rendered by courts of this state, are separate and distinct from property tax revenues, and that it is the intent of the Legislature in enacting this act to nullify the holding of the court in City of Los Angeles v. County of Los Angeles. . . ."

[12]See page 4 of the Summary of Proposed Implementing Legislation and Drafters' Intent with regard to article XIII B of the California Constitution (Prop. 4, Nov. 6, 1979).

and conclude that "property tax revenue" does not include interest which may be earned on property taxes after their collection by the county. The trial court's conclusion to the contrary must therefore be reversed.

3. *The Base-year Figure for Tax Transfer Must Be Adjusted for Increases in Assessed Values Taking Place Between Base Year and Year of First Distribution.* When a proposal for incorporation of a new city is filed with the Local Agency Formation Commission, the commission notifies the county auditor of the proposed transfer of services. (§ 56842, subd. (b).) The auditor then makes the calculations which we have previously described leading to a determination of the "auditor's ratio." (§ 56842, subd. (c)(1).) Although not so labeled by any statutory provision, the year for which these calculations are made is generally termed the "base year." The fiscal year in which funds are first reallocated from the county to a new city is, however, always at least one year later than the "base year." City's application in this case was filed late in 1986, with the result that the base year was fiscal 1985-1986.[13] Formal incorporation did not occur until November 1987, and the first fiscal year of actual reallocation of funds was 1988-1989. Thus there was a three-year interval between the base year and the year of first allocation.

The dispute between the parties relates to what adjustment, if any, should be made to the base-year figures in computing the actual distribution to be made in the later first year of reallocation of revenues. County claims that no adjustment should be made, relying on the literal wording of controlling statutes. The rules governing allocation of property tax revenues among the various governmental entities within a county are contained in part 0.5, chapter 6, commencing with section 95, of the Revenue and Taxation Code. The allocation of revenues for newly incorporated cities is prescribed by Revenue and Taxation Code section 99, subdivision (a)(2), which states:

"In the case of a city incorporation . . . the auditor shall assign the allocation of property tax revenues determined pursuant to section 56842 of the Government Code to the newly formed city . . . ." Section 56842 contains the formula for determining the allocation to a new city. The end product of the formula is a figure which is "the amount of property tax revenue used to provide services by each affected local agency during the prior fiscal year within the area subject to the proposal." (§ 56842, subd.

---

[13]Instead of using the 1985-1986 figures to compute the "total net cost" of services City would assume, the auditor used 1986-1987 figures. City and County appear to agree that this was an error and that a recalculation of the allocation should utilize 1985-1986 as the base year.

(c)(3).) Subdivision (e) then provides that the executive officer of the commission shall notify the auditor "of the amount determined pursuant to paragraph (3) of subdivision (c) . . . and the auditor shall transfer that amount to the new jurisdiction." There is no provision for adjustment of the figure derived by the formula of section 56842. While adjustments after the first year of allocation will be appropriate, as with any governmental entity (Rev. & Tax. Code, §§ 97, 99, 99.4), there is simply no provision, County argues, for alteration or adjustment of the section 56842 figure for the first year in which it is allocated to the new city.

City argues that such treatment would be inequitable and illogical. The allocation scheme for all existing tax-receiving entities in a county permits adjustments each year for increases in assessed values within the entity's geographical boundary. Adoption of County's position, City maintains, would create an orphan entity of a new city. Since the first year of allocation of funds is always later than the base-year calculation (in this case three years later), the new city will be shorted in its initial allocation. Since all subsequent allocations build upon the initial allocation, such city's allocation would perpetually be lower than the actual costs incurred by the city in providing governmental services.

The trial court ruled in favor of City, holding that in determining the allocation of tax revenues for 1988-1989 the auditor must "take[] into account growth in assessed value from 1985-86 to 1986-87 and 1986-87 to 1987-88." We agree with the trial court. City's argument not only accords with common sense, but is consonant with the overall statutory plan. Revenue and Taxation Code section 97 determines current tax allocations by starting with the prior year's property tax revenue and adjusting for the "annual tax increment." A new city of course has no prior property tax revenue history which can be adjusted, and hence section 56842 creates a computation by which a hypothetical previous year's revenue can be determined. It would be contrary to the overall statutory objective to apply this "prior year" tax calculation to the subsequent year without adjustment. To do so would be to ascribe to the Legislature an intent to penalize all new cities. No such intent is discernible in this statutory scheme. (See Rev. & Tax. Code, § 93 et seq., and Cal. Const. arts. XIII A and XIII B; *Stafford* v. *L. A. etc. Retirement Board* (1954) 42 Cal.2d 795, 799 [270 P.2d 12]: " '[E]very statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect.' ")[14]

4. *City Is Not Precluded by Equitable Defenses From Asserting the Errors in Tax Allocation Calculations.* County raises several affirmative defenses to

---

[14]County's position is to some extent undermined by the action which it initially took respecting adjustment of the base-year calculation. It used 1986-1987 cost data to calculate City's share of property taxes, rather than 1985-1986, and then adjusted that amount by 16.29

City's request for mandated recalculation of its property tax revenue allocation. The defenses are based upon the factual circumstances which surround the formation of any new city, including City in this case. The incorporation process includes fiscal analysis (§ 56833.1), hearings before the Local Agency Formation Commission (§ 56840), determination by the commission of the calculations leading to the reallocation of tax revenues (§ 56375, subd. (q)), notification to interested parties of the commission's determinations (§§ 56852, subd. (a), 56853), the holding of noticed hearings before the board of supervisors (§§ 57025, 57026), and a public election to approve the terms and conditions of incorporation (§ 57100). City does not dispute that the ratios, calculations and tax estimates now being challenged were set forth in appropriate notices, were publicized at the hearings, and were known by the individuals interested in forming the new city. Such individuals were given an opportunity at several junctures to voice opposition, produce evidence or interpose objections to the County auditor's recommendations and the supervisors' resolution. They did not do so. Time has now passed, County argues, and budgetary decisions have been made in reliance on the tax allocations approved at these various hearings.

County characterizes these defenses as laches, estoppel and failure to exhaust administrative remedies. The trial court, in a terse ruling, found these defenses "to be without merit." We have not previously in this opinion discussed the scope of our review of the trial court determinations, because up to this point we have only dealt with determinations of matters of law, and hence our review has been complete. (*Sutco Construction Co. v. Modesto High School Dist.*, *supra*, 208 Cal.App.3d at p. 1228 (interpretation of statute is a question of law, subject to final determination by appellate court).) The equitable defenses posed by County, however, involved findings of fact. While specific and detailed factual findings were not made by the trial court, the ultimate determination rejecting the defenses of necessity implies subsidiary factual findings. ■ Our review of the court's factual conclusions requires their affirmance if supported by substantial evidence, and the evidence will be considered in the light most supportive of the court's judgment. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 278, p. 289.)

■ The defense of laches requires a showing of unreasonable delay on the part of the plaintiff in bringing the action, which may show abandonment or waiver of a right, or the acquiescence by the plaintiff in the defendant's fault. (30 Cal.Jur.3d, Equity, § 41, pp. 542-543.) ■ City was incorporated in November 1987. The letter advising City of its first allocation of

percent, which represented the growth in assessed value from 1986-1987 to 1987-1988. County therefore impliedly admitted the necessity of adjusting the base figures for an annual increment in assessed property valuations. It was only when it was discovered that the figures for 1985-1986 should have been used instead of 1986-1987 that County changed its position.

property tax revenues, for the fiscal year 1988-1989, was received on December 9, 1988. Studies showing errors in the tax calculation were prepared for the benefit of City early in 1989. The petition for writ of mandate was filed in November 1989, well within any presumably applicable statute of limitations. Under these circumstances the trial court's implied finding of due diligence, and the existence of no unreasonable delay, is well supported by the facts.

■ Estoppel is the equitable concept of precluding a party from taking unfair advantage of the reliance by another party on the first party's representation or conduct. Typical elements of an estoppel are (1) a misrepresentation or concealment of facts, (2) knowledge by the first party of the falsity of the facts represented, (3) ignorance on the part of the misled party of the true facts, and (4) action taken by the misled party upon the basis of the representation. (11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 177, pp. 858, 859.) ■ Several of the factual bases for estoppel are either clearly absent in this case, or at minimum could have been found not proved by the court. The alleged "reliance" by County was upon City's supposed acquiescence in the initial determination of property tax allocation. The difficulty with this position is that at the time of such determination City was not in existence, and surely had no agents authorized to make representations or to engage in conduct binding on City. Further, it cannot be said that City knew of the inaccuracy of the tax allotment. Most importantly, perhaps, the court was warranted in finding no evidence for the proposition that County had incurred detriment by reason of shorting City on its property tax allotment.

■ The defense of exhaustion of administrative remedies could conceivably apply to two stages. County's argument centers around the procedures related to City's incorporation, including the hearings before LAFCO and the board of supervisors. There is also at least a potential claim that, prior to filing its writ petition, City could have utilized some sort of effort at administrative resolution of its dispute with County after discovering the erroneous tax calculation.

Concerning the first stage: County emphasizes the detailed and lengthy procedures required for the incorporation of a city, and highlights the fact that the calculations resulting in the tax allocation to City were published, reviewed and subject at several points in the process to objection or correction. Failure to raise objections to the calculations then presented, County contends, constitutes a neglect of administrative processes which should now bar resort to judicial review.

The difficulty with this thesis is that the procedures leading to incorporation of a city are not truly administrative adjudication. LAFCO and the board

of supervisors assuredly are administrative agencies. Their work in the incorporation process, however, is not creative of the sort of "administrative tribunal" adjudication which can reasonably be determined to be a condition precedent to judicial relief. Where "[t]he administrative tribunal is created by law to adjudicate the issue sought to be presented to the court" (3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 234, pp. 264-265), then recourse first to the administrative tribunal is a reasonable condition to court relief. Here, however, there was no dispute subject to adjudication. The work of LAFCO, the County auditor and the board of supervisors was in the nature of foundational factfinding determinations. Besides, as we have mentioned above, City was not even in existence at the time of the hearings in issue, and can hardly be said to have failed to exhaust its remedies when it could not effectively appear.

As to potential administrative remedies *after* incorporation, we find that City pursued whatever was practically available. It made demand upon County for recalculation of the tax allocation. Its letter request was denied by the County administrative officer. There is no claim-filing requirement as a prerequisite to an action in traditional mandamus seeking to compel distribution of funds as required by statute. (*County of Sacramento* v. *Lackner* (1979) 97 Cal.App.3d 576, 587-588 [159 Cal.Rptr. 1].) No method was prescribed by which City could achieve an administrative adjudication of its claim. "The exhaustion requirement is inapplicable where an effective administrative remedy is wholly lacking." (3 Witkin, Cal. Procedure, *supra*, § 238 at p. 269.)

## DISPOSITION

The trial court's judgment denying City relief in terms of recalculation of its allotment of property taxes based upon City's contention that both direct and indirect costs should be included in the figure used for "total net cost" is ·reversed. City is entitled to a calculation of property tax revenue allotment based upon all costs incurred by County for the period in question for services which have been transferred to City. The court's determination with respect to the inclusion of supplemental property taxes as part of "property tax revenues," a matter not disputed at trial, is affirmed. The court's determination that interest on collected property tax revenues must be categorized as "property tax" is reversed. The court's determination with respect to the base year for calculation of property tax allotment and the incremental increases appropriate for each subsequent year, based upon increases in assessed values, is affirmed. Each party shall bear its own costs.

We are of the opinion that this disposition, together with the analysis provided herein, should be sufficient guidance to the County auditor and

board of supervisors to permit recalculation of the appropriate property tax allotment without further recourse to the trial court. However, the trial court is vested with jurisdiction to entertain postappeal motions to further construe or implement this court's decision, as may be found necessary or appropriate by any party.

Todd, Acting P. J., and Huffman, J., concurred.

A petition for a rehearing was denied April 15, 1992, and the petition of appellant County of San Bernardino for review by the Supreme Court was denied June 18, 1992.